[No. 39853.    Department One.    June 26, 1969.]

J & J Food Centers, Inc., *Appellant,* v. Martin Selig *et al., Respondents.**

*Breskin, Rosenblume & Robbins,* by *Arnold B. Robbins,* for appellant.

*Reported in 456 P.2d 691.

*Stern, Gayton, Neubauer & Brucker* and *Thomas H. S. Brucker,* for·respondent Selig.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *James L. Magee,* for respondents Associated Grocers, Inc., et al.

FINLEY, J.—Jack V. Warren, Sr., and his wife, and J. W. Sessums, and his .wife, were the operators and ostensible owners of J & J Food Centers, Inc., a Washington corporation. The corporation became a lessee of space for a grocery store in Martin Selig's shopping center. The relevant provisions of the lease were as follows:

> The term of this lease shall be for twenty years and no months, and shall commence on or about November ·1, 1964. . . . [Paragraph 3 of the lease]
>
> . . .
>
> Any percentage of rentals due over and above the base rental of $1,512.50 per month on an annual basis, shall be charged against the lease deposit during the term of this lease . . . [Paragraph 4.a. of the lease]
>
> . . .
>
> As partial consideration for the execution of this lease, the Lessee has this day paid. the Lessor the sum of Four Thousand Five Hundred Thirty-seven and 50/100 ($4,537.50) Dollars, the receipt of which is hereby ac-·knowledged. If the Lessee shall have fully complied with all· of the covenants, agreements, terms and conditions of this lease, but not otherwise, said sum so paid. shall be credited on the payment of the last three month's minimum rental of the term of this lease. .[Paragraph 5 of the lease]

The sum of $4,537.50 was paid in cash to Martin Selig pursuant to the above quoted provision of paragraph .5 of the lease. Thereafter, the operation of the J & J Food Centers, Inc. was not a financial success. When insolvency unquestionably threatened the corporation, Messrs. Warren and Sessums became interested in finding a buyer for the food center, and in effecting a release for themselves and their wives from liability under the 20-year lease. They found one prospective assignee of their lease-hold interests and liabilities. However, this party was unacceptable to Selig as a tenant for credit security reasons.

Selig also was interested in replacing J & J as a tenant and had commenced independent inquiries in this connection in the Seattle area. He found that Associated Grocers, Inc. would lease on behalf of one of its members, Dietzen's, Inc. Associated Grocers was financially acceptable to Selig as lessee. Selig informed the attorney for J & J that Mr. Jack Shaw, agent for Associated, would present a proposition to them on behalf of Associated and Dietzen's.

An agreement was drafted whereby Dietzen's, Inc. would purchase appellant's assets. Selig agreed to release J & J and Messrs. Warren and Sessums, and their wives, from the old lease. J & J's balance sheet carried as an asset the sum of $4,537.50, listed in current assets as a "lease deposit." Dietzen's refused to purchase this asset. Associated Grocers, Inc. had sufficient assets, credit, and bargaining power to adopt a business policy of not putting up lease deposits. Associated Grocers, Inc. executed a new lease rather than taking an assignment of the J & J lease.

At this point in the negotiations, Shaw was dealing with Warren and Sessums. When Shaw refused to purchase the lease deposit as an asset of J & J and requested it be deleted from the purchase agreement, Warren and Sessums contacted their attorney, who had prepared the draft from which the parties were negotiating. He conversed with Shaw, and then approved the deletion of the item from the purchase agreement. Shaw deleted it, making a notation on the agreement that the landlord, Selig, would take care of it. Warren and Sessums and their attorney did not discuss the matter directly with Selig, nor did Selig make any commitment to them. The sale of J & J's assets and the re-leasing of the store space to Associated and release from liability of J & J, Messrs. Warren and Sessums, and their wives, were consummated.

Subsequently, Selig took the position that the so-called "lease deposit" was not to be considered as such but as consideration for the execution of the lease. J & J brought suit to recover the "deposit," and for alternative relief against Selig, for creating an apparent agency in Shaw, and

against Associated and Dietzen's for negligent misrepresentation by Shaw. Selig counterclaimed for attorney's fees against J & J and the Warrens and Sessums. Associated cross-claimed against Selig for judgment on the basis of misrepresentations by Selig to Shaw if Associated was found liable. Selig cross-claimed against Dietzen's and Associated because of the unauthorized statements of Shaw, their agent, in the event Selig was found liable.

At the close of the plaintiff's case, the trial court cut the Gordian knot by dismissing J & J's case against Selig on the basis that the "deposit" was consideration for the lease, and by dismissing J & J's agency claims against Selig and Dietzen's and Associated for insufficient evidence. Judgment was entered on Selig's counterclaim for attorney's fees against the Warrens, and all other claims were dismissed. J & J has appealed from the judgment, excepting the dismissal of the various claims and counterclaims between Selig and Associated Grocers and Dietzen's.

Error has been assigned to the conclusion of the trial court that the "lease deposit" was partial consideration, to the refusal of the trial court to find the lease provisions ambiguous and allow the jury to consider parol evidence as to the nature of the "deposit," and to dismissal of the apparent agency claim against Selig and the negligent misrepresentation claim against Dietzen's and Associated Grocers for insufficient proof of damages.

■ At least three legal conclusions can arise when a lease deposit is made. It may be security against actual damage to the lessor; it may be liquidated damages to which the lessor becomes entitled in event of breach; it may be additional consideration for the execution of the lease. Which of these conclusions is to be given legal effect depends upon the language of the lease, and in some cases upon evidence outside the lease. Appellant contends that the provisions of this lease as to credit of the "deposit" against the final 3 months' rent and against percentage rentals created an ambiguity in the lease, if not a clear indication that the lease exacted a security deposit.

308

A lease provision for credit against the final 3 months' rent has been held to be consistent with an intent that a deposit comparable to that in the instant case is additional consideration to the landlord for the execution of the lease. *Dutton v. Christie*, 63 Wash. 372, 115 P. 856 (1911). It is clear that such treatment is to some extent fictional. However, when businessmen of some experience, assisted by an attorney, *negotiate* and *draft* a lease agreement, reliance upon the effect of the agreement assumes an importance which is not present when the evidence establishes that a party with superior knowledge and bargaining power has presented a boiler-plated contract on a take-it or leave-it basis to an unadvised layman. Under the latter circumstances, evidence in parol assumes an importance not generally found in a commercial transaction and abuses of superior bargaining power require close scrutiny. *Cf.* RCW 62A.2-104; 62A.2-302; 6A A. Corbin, Contracts § 1376 (1962); A. Ehrenzweig, Conflicts of Law § 172 (1962).

In a commercial lease, the arrangement for credit against percentage rentals is simply an extension of the rule of *Dutton v. Christie, supra.* It is more favorable to the appellant than the rule of that case, for it permits what is technically treated as consideration paid to the landlord to be earned back by a successful tenant long before the lease term expires. If the arrangement has an infirmity, it is only the long-standing fiction approved in *Dutton v. Christie.* While in a noncommercial lease that fiction can result in unconscionable exactions, especially with regard to a form lease for housing, we do not deal with that problem. In the instant case preservation of the fiction allows businessmen to contract among themselves for a variety of commercial arrangements and is therefore to be favored.

We conclude that, as a matter of law, the lease provisions unambiguously established the "deposit" to be additional consideration to the landlord, which he was entitled to retain unless specific earn-back provisions of the contract were complied with.

Relief was sought against Selig in the alternative for damages based upon an apparent authority created in Shaw. The testimony shows no more than that Selig indicated that Shaw would present a proposition on behalf of Associated and Dietzen's, and that Associated was an acceptable tenant to Selig.

■ Apparent or ostensible authority can be inferred only from the acts and conduct of the asserted principal. Facts and circumstances are sufficient to establish apparent authority only when a person exercising ordinary prudence, acting in good faith and conversant with business practices and customs, would be misled thereby, and such person has given due regard to such other circumstances as would cause a person of ordinary prudence to make further inquiry. *Lamb v. General Associates, Inc.,* 60 Wn.2d 623, 374 P.2d 677 (1962), *and cases cited.* The evidence of Selig's actions and statements introduced in this case is not such that reasonable men could differ as to the result of application of the above standard, and the case against him was therefore properly taken from the jury.

The claim against Associated and Dietzen's is not so easily disposed of. This claim, like that against Selig, was dismissed by the trial court for insufficient proof of damages. That court was of the opinion that there was no evidence of the price at which the parties would have closed the sale with the lease deposit included, and therefore that computation of the lost benefit of the bargain or of tort damages would be pure speculation on the part of the jury. We do not agree.

■ Assuming for the moment that the other elements of a cause of action were present, we must inquire into the value of a right to recover a lease deposit under the circumstances in this case. In attempting to sell the right to Dietzen's, J & J valued it at its face value. Given possible contingencies which could occur during the lease term, that was an optimistic valuation. On the other hand, the right to the deposit, assuming successful performance and continued solvency of both the new lessee and the lessor,

would be worth the amount of the deposit, discounted for the lease term. If the new lessee was required to make a similar deposit, in the same amount, the value of an assignment of the rights to the deposit would agree fairly closely with the face value of the deposit discounted by the possibility of enforcement of the assignor's rights to the deposit by the new lessee. And, if the lease had been assigned, the characterization of the deposit as "consideration" would have had no effect upon the assignee's right to recovery by successful performance of the lease.

The agreement of sale between J & J and Dietzen's did not list a total price—it scheduled the assets of J & J. Some prices were fixed with respect to cost, cost plus, or retail on the basis of an inventory to be conducted. Other prices were fixed at a definite dollar value; among these was that for the lease deposit. The value fixed would have been a reasonable one had the lease been assigned by J & J—it was the face value of the so-called deposit.

It is apparent from this analysis that two circumstances combined to render the right to the deposit valueless; the legal characterization of the deposit as consideration, and the fact that J & J did not assign the lease to Associated, but instead took a release from liability while Selig executed a new lease to Associated. Had the lease been assigned to Associated and the deposit "sold" to Dietzen's, successful performance of the lease would have entitled them to return of the consideration.

The deposit was not "sold" to Dietzen's. In consequence of the deposit not being sold, the assets negotiated for changed hands at a price abated by the face value of the deposit. Whether the benefit of the bargain rule or the out-of-pocket rule is applied in these circumstances, the result is the same. See Annot., 13 A.L.R.3d 875, 970 (1967). Both rules have been recognized in Washington in the analogous action for deceit. *Gnash v. Saari*, 44 Wn.2d 312, 267 P.2d 674 (1954), *but see* 1 F. Harper & F. James, Torts § 7.15, at 592-93 (1956). Since rights retained by J & J were valueless, allegedly as a consequence of the misrepresen-

tation by Mr. Shaw, the damages by application of either rule would be the asking price of the deposit, which was identical to its refund value *if Shaw's representation had been valid*, and could in fact have been relied upon by J & J.

■ We now turn to the dispositive question as to the claim against Associated and Dietzen's. Did the appellant set forth a prima facie case showing actionable negligent misrepresentation by Shaw?

When relied upon by the purchaser to his damage, false statements made to induce a sale, although innocently made and believed by the speaker to be true, are as actionable as if known to be false and made with intent to deceive. But the gist of the action is negligence and not fraud or deceit.

*Brown v. Underwriters at Lloyd's*, 53 Wn.2d 142, 150, 332 P.2d 228, 233 (1958). The elements of the action are false statements, made to induce a sale, which are relied on by the person asserting damages, and which that person may justifiably rely upon. As the measure of fault is negligence, the measure of justification is ordinary care.

The damage issue has already been discussed. The only other element disputed by respondents Associated and Dietzen's in support of judgment is factual reliance. J & J's counsel testified as follows:

[Mr. Warren] seems to think I was at home at the time he called me to the effect that Mr. Shaw was there with the purchase agreement and that Mr. Shaw had advised him that a change would have to be made with reference to the payment of the lease deposit by Dietzen's to the clients as part of the purchase price, and I spoke to Mr. Shaw and discussed the matter with him at which time he told me that he would insert the words "To be repaid by"—Well, whatever they are; I don't remember. We discussed the exact wording. He advised that Mr. Selig had told him this would be taken care of directly and not through the purchase and sale agreement. He also advised me that Associated Grocers was the new tenant and that there was a lease being drawn between Associated Grocers and Mr. Selig and that Associated would not have to deposit a lease deposit with Mr. Selig. . . .

I do recall that he said that he had spoken directly to Mr. Selig, that Mr. Selig would take care of the matter directly with the clients, and that Mr. Selig would return it. Now, I don't know if he used Mr. Selig's words. This is the nature of our conversation generally resulting in his insertion of the words "To be returned by the landlord," because without a provision of the repayment of the lease deposit to my clients, they would not have executed the agreement.

On cross-examination, the following testimony was given:

A. It is my understanding that his instructions were that [Selig] would repay it, because those are the ultimate words that he put in the agreement at that time. Q. That is your now understanding, Mr. Rosenblume; isn't that correct? A. No; no, because he discussed these words "To be returned by the landlord" with me on the phone before I authorized my clients to sign the contract. Q. But you didn't—He never did state to you that Mr. Selig said that he would return it? A. I don't know whether he said it or he didn't say it.

Such testimony would clearly justify an inference that J & J and their counsel had in fact relied upon the representation made by Shaw in concluding the sale. It is in some respects contradictory, but in this posture of the case we are required to view it in the light most favorable to the plaintiff. The weight and credibility of the evidence are for the trier of fact.

The only other element of the cause of action which requires discussion is justifiable reliance. The issue here is whether plaintiff exercised ordinary care in relying upon Shaw's representation. The evidence, viewed in the light most favorable to plaintiff, is sufficient that reasonable men might differ as to the determination of that issue.

There is accordingly no appropriate disposition other than to affirm the dismissal as to respondent Selig, and to reverse and remand as to respondents Associated Grocers, Inc. and Dietzen's, Inc. for a retrial upon the claim asserted against them arising from the misrepresentation by Shaw. The judgment will be affirmed in all other respects. It is so ordered.

HUNTER, C. J., WEAVER, HAMILTON, and McGOVERN, JJ., concur.