727 F.2d 826
 Blue Sky L. Rep. P 71,936, Fed. Sec. L. Rep. P 99,699,
15 Fed. R. Evid. Serv. 241
Ernest M. BURGESS, Edward H. Morgan, Clarence C. Pearson,
John S. Tytus, and Lucius D. Hill, Plaintiffs-Appellees,
v.
PREMIER CORPORATION, a Delaware corporation, William L.
Brittain, Robert M. Bohlen, C. Gerald Haarer, and Herman L.
Schrock, Louis Rosen and R.A. Lile, substituted for W.E.
Darby, Defendants-Appellants.
Ernest M. BURGESS, Edward H. Morgan, Clarence C. Pearson,
John S. Tytus, and Lucius D. Hill, Plaintiffs-Appellants,
v.
PREMIER CORPORATION, a Delaware corporation, William L.
Brittain, Robert M. Bohlen, C. Gerald Haarer, and Herman L.
Schrock, Louis Rosen and R.A. Lile, substituted for W.E.
Darby, Defendants-Appellees.
 Nos. 82-3064, 82-3090.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 2, 1983.
Decided March 5, 1984.
 
 Ron J. Perey, James A. Smith, Jr., Mark Roellig, Perey & Smith, Seattle, Wash., for plaintiffs-appellees.
 Theodore J. Collins, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., James L. Magee and Bob M. Schwartz, Sax & MacIver, Seattle, Wash., Leonard L. Scott Eichenbaum, Scott, Miller Crockett, Darr & Hawk, Little Rock, Ark., for defendants-appellants.
 Appeal from the United States District Court for the Western District of Washington.
 Before GOODWIN, WALLACE and REINHARDT, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 Premier et al., alleging numerous errors, appeal a jury award of damages for state and federal securities law violations and common law fraud. Premier et al. also allege that attorney fees were incorrectly awarded to plaintiffs. Plaintiffs cross-appeal seeking prejudgment interest.
 
 
 2
 Five doctors from the Seattle, Washington area purchased tax shelter investments in cattle herds from Premier, a Delaware corporation formed in 1969. Premier sold cows to investors; the investors then entered into management contracts with Premier. High income investors were able to benefit from tax shelter features of the investments. Premier represented to investors that its cattle were of superior quality.
 
 
 3
 Premier first became registered with the Securities and Exchange Commission in June 1971. A second registration with a related prospectus took effect in June 1972. The doctors purchased their investments between 1971 and 1973 under one or both of the 1971 and 1972 registration statements and prospectuses. Each doctor claimed extensive tax deductions for the purchase, maintenance, and depreciation of his herd. After losing money for several years on their investments, four of the doctors sold their herds back to Premier, and one disposed of his herd on the open market. Each sold at a substantial loss. The doctors' herds were liquidated between 1975 and 1978.
 
 
 4
 In 1978 the five doctors filed this action against Premier and directors Bohlen, Brittain, Haarer (also officers), Schrock, and Darby. Darby never was an officer or employee of Premier. He resigned effective July 1, 1971, because of poor health, and died in 1979. Executors were appointed and substituted in this litigation.
 
 
 5
 The doctors claimed that Premier et al. violated federal and state securities laws and Washington's consumer protection law and committed common law fraud and negligent misrepresentation by failing to disclose the stocking of herds with low quality animals at inflated book values, failing to disclose director Darby's offer to resign, circulating unrealistic cash flow projections, failing to disclose certain acquisitions, and engaging in stock transactions contrary to the company's and investors' best interests.
 
 
 6
 Trial began in June 1981. Defense motions for summary judgment and directed verdict on the grounds that the actions were barred by applicable statutes of limitations or that the doctors had signed releases were denied by the trial judge. The jury returned special verdicts finding all named defendants liable on all claims, except that Schrock and Darby were not found liable on the Washington Consumer Protection Act claim. The doctors were awarded damages and attorney fees.
 
 I. Statute of Limitations
 
 7
 Doctors filed this action on June 21, 1978. Under applicable statutes of limitation, Premier et al. moved for summary judgment on the ground that there was no disputing that the doctors had actual or constructive notice of their fraud claims more than three years before filing this action; i.e., before June 21, 1975.[1]
 
 
 8
 Summary judgment was properly denied because there was a genuine issue of material fact as to when the doctors knew or had notice of their claim. Subsequently, the issue of the statute of limitations was submitted to the jury pursuant to instruction number 38.[2] The jury necessarily found that the statute of limitations had not barred the action when it affirmatively answered a general question finding Premier et al. liable. To emphasize the importance of the time-bar question to the jury, either party could have had a special verdict question directly addressing the statute of limitations. However, under Fed.R.Civ.P. 49(a) a party waives its right to demand submission of a special verdict question on an issue unless it objects to the failure to submit the special question before the jury retires. 9 Wright and Miller, Federal Practice and Procedure: Civil Sec. 2507. Premier et al. did not so object.
 
 II. Releases
 
 9
 When Premier repurchased the cattle herds from the doctors, each doctor filed a document releasing Premier from all claims. Premier moved for summary judgment and later for a directed verdict on the ground that the releases were sufficient to exonerate Premier from all claims made by the doctors. The motions were properly denied.
 
 
 10
 The intent of the releases, their application to known and unknown facts, and the disclosures and promises surrounding the releases were all questions addressed to the jury under Washington law and federal securities law.
 
 1. Federal securities claims
 
 11
 A release is valid for purposes of federal securities claims only if the doctors had "actual knowledge" that such claims existed. Royal Air Properties, Inc. v. Smith, 333 F.2d 568 (9th Cir.1964). Since each doctor indicated by affidavit and trial testimony that he did not know of any claims he could have raised until after he signed the release, there was a material issue of fact for the jury. Thus, the motion for summary judgment was properly denied. Because a reasonable juror could have concluded that the doctors actually were unaware of their claims, the motion for directed verdict was also properly denied.
 
 2. State securities claims
 
 12
 While there are no cases on releases of claims under the Washington Securities Act, Washington courts would apply the "actual knowledge" test because the state Act provides that it is to be coordinated with related federal law. RCW 21.20.900. Washington's anti-waiver provision is very similar to the federal anti-waiver provision. Cf. RCW 21.20.430(5) with 15 U.S.C. Sec. 78cc(a). Because Royal Air Properties, supra, provides the relevant federal law for Washington state, the motions for summary judgment and directed verdict were properly denied.
 
 3. Remaining state law claims
 
 13
 Under Washington law, a release is valid unless there was fraud, misrepresentation, or overreaching in its procurement. Metropolitan Life Insurance Company v. Ritz, 70 Wash.2d 317, 422 P.2d 780, 783 (1967).
 
 
 14
 Doctors alleged that Premier et al. stocked at least some of the herds with inferior cows. Upon repurchase, Premier et al. allowed doctors to assume that the low repurchase price offered was due to market decline rather than inferior quality. These releases were a condition of the repurchase. Thus, a jury question existed as to whether the releases were fraudulently obtained, and summary judgment was therefore inappropriate. Because a reasonable jury could have believed that the releases were fraudulently procured, a directed verdict was also inappropriate on these claims.
 
 III. Schrock and Darby
 1. Federal securities claims
 
 15
 Schrock and Darby moved for directed verdicts on the grounds that there was insufficient evidence to establish the scienter required for violation of Sec. 10(b) of the Securities Act of 1934, 15 U.S.C. Sec. 78j, and S.E.C. Rule 10b-5, 17 C.F.R. Sec. 240.10b-5, and that their lack of involvement with Premier precludes any derivative liability as controlling persons. The district court should have granted these motions.
 
 
 16
 Scienter is a necessary element of a violation of Sec. 10(b) and Rule 10b-5. Aaron v. SEC, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980). The scienter requirement encompasses knowing or reckless conduct, Kiernan v. Homeland, Inc., 611 F.2d 785, 787 (9th Cir.1980) (citing Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978)), but not negligence. Aaron, 446 U.S. at 690, 100 S.Ct. at 1952 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, 197-99, 96 S.Ct. 1375, 1381, 1383-84, 47 L.Ed.2d 668 (1976)). A person possesses the requisite scienter if the person either deliberately misrepresents or omits material information, or acts recklessly, i.e., if the person
 
 
 17
 "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although they could have done so without extraordinary effort." Kiernan v. Homeland, Inc., 611 F.2d at 788.
 
 
 18
 A controlling person is liable for the acts of another if the controlling person "acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action." Strong v. France, 474 F.2d 747, 752 (9th Cir.1973). This court has indicated that there can be no liability if the controlling person "was not a participant in ... activities which are claimed to violate the securities laws." Christoffel v. E.F. Hutton & Co. Inc., 588 F.2d 665, 669 (9th Cir.1978). A director "is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed." Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981). See Cameron v. Outdoor Resorts of America, Inc., 608 F.2d 187, 194-195 (5th Cir.1979), modified, 611 F.2d 105 (5th Cir.1980) (per curiam).
 
 
 19
 Schrock was not a controlling person nor did he possess the requisite scienter. Schrock was uninvolved in Premier's day to day operations. He had no experience in Premier's business, nor in Premier's industry, and he had nothing to do with preparation of the 1971 and 1972 prospectuses.
 
 
 20
 Darby's interaction with Premier et al. was also minimal, due partly to ill health. He also had no contact with any of the doctors. He resigned before any of the doctors lost any money. The doctors assert that Darby owned a ranch that was sold to Heifer Project (a charitable organization which distributes inferior cattle donated to it), that he resigned from the Premier Board, and that he was a "shrewd, powerful, and experienced businessman." These assertions, even if true, do not indicate participation in the activities about which the doctors complain.
 
 
 21
 Thus, neither Darby nor Schrock could reasonably have been found to be controlling persons. See Herm, 663 F.2d at 685.
 
 
 22
 Nor does there appear to be any evidence of participation sufficient to show that Schrock or Darby were reckless with regard to representations or omissions made to the doctors by Premier's other directors. Kiernan, 611 F.2d at 787-88. Thus, they could not be found to have possessed the requisite scienter under federal securities laws. Because "the evidence permits only one reasonable conclusion as to the proper result," Maheu v. Hughes Tool Co., 569 F.2d 459 at 464 (9th Cir.1977), the district court should have granted their motions for a direct verdict. Accordingly, we vacate the judgment against Schrock and Darby with regard to federal securities law claims and direct the entry of a judgment in their favor.
 
 2. Washington securities claims
 
 23
 Darby's and Schrock's motions for directed verdict on the ground that they could not be found liable under the Washington Securities Act, RCW 21.20.010 and 21.20.430 also should have been granted. First, 21.20.010 closely resembles its federal counterpart, Rule 10b-5. Although scienter is not required under Washington law, Kittilson v. Ford, 93 Wash.2d 223, 225-27, 608 P.2d 264, 265 (1980), some liability-producing action by Darby and Schrock themselves is required. And because there is no evidence that either Schrock or Darby made any misrepresentations, they are not subject to liability under this statute. Second, while a controlling person could be liable under RCW 21.20.430(3) on derivative liability, there is no reason to infer that "controlling person" has a different meaning in Washington law than in federal law. Since Schrock and Darby were not controlling persons under the federal definition, they could not properly be liable under Washington law.
 
 3. Common law fraud or misrepresentation
 
 24
 The absence of any act or omission by Schrock or Darby in connection with the representations of which the doctors complained precludes finding either one liable for common law fraud or negligent misrepresentation. For the elements of these offenses in Washington, see J & J Food Centers, Inc. v. Selig, 76 Wash.2d 304, 309, 311, 456 P.2d 691, 695 (1969) (negligent misrepresentation); Farrell v. Score, 67 Wash.2d 957, 958-959, 411 P.2d 146, 148 (1966) (fraud).
 
 4. Darby's estate
 
 25
 Because we reverse the finding on Darby's liability, we do not address whether the district court abused its discretion in allowing substitution of Darby's estate.
 
 IV. Evidentiary Objections
 
 26
 In deciding whether to admit or exclude evidence, including expert evidence, the trial court has broad discretion. Lies v. Farrell Lines, Inc., 641 F.2d 765 (9th Cir.1981); Burlington Northern, Inc. v. Boxberger, 529 F.2d 284 (9th Cir.1975). On appeal, a ruling which admits or excludes evidence, even if an abuse of discretion, will not be overturned if the error is harmless. Fed.R.Civ.P. 61.
 
 1. Tilton
 
 27
 In essence, Premier et al. argue on appeal that by sustaining objections to certain parts of Tilton's testimony the court ruled that Tilton was not an expert. They argue that therefore all of Tilton's testimony should have been disallowed. However, the record shows that Tilton did qualify as an expert by virtue of his experience and investigations. Premier et al. had ample opportunity to impeach Tilton's testimony. Therefore, there was no error in permitting his testimony to go to the jury.
 
 
 28
 Because Tilton was testifying as an expert witness, the books on cattle investments were admissible under the learned treatise exception to the hearsay rule. Fed.R.Evid. 803(18). Tilton indicated that the author was the preeminent industry expert; this was not disputed. Tilton also testified that Premier required its salesmen to read the books and to recommend them to investors. These facts substantiate the idea that the books were accepted authority. Furthermore, Premier et al. raised no objection to the books on the ground that they were not "learned treatises."
 
 
 29
 Premier et al. also cite as error the admission on redirect of Tilton's opinion as to how and by whom the fraud--in which Tilton admitted unwitting participation--was perpetrated. However, Premier's counsel waived this objection by first raising the subject himself on cross-examination. Doctors could properly pursue this line of questioning on redirect where defense counsel had "opened the door." 1 J. Weinstein & M. Berger, Weinstein's Evidence p 103 at 12-15 (1982) (attorney can waive client's right to raise error on appeal by eliciting inadmissible evidence himself). Thus, while Tilton's testimony did indeed contain a legal conclusion, Premier et al. waived its right to object.
 
 
 30
 Finally, Premier et al. contend that the trial court erred in excluding an injunction issued against Tilton's former employer in which Tilton was also named. The trial judge refused to admit the injunction because of concern about the lack of a signature, the lack of findings of fact, and a question about the jurisdiction of the issuing court in North Carolina. The trial judge was also correctly concerned that certain conclusory statements in the injunction had never been challenged by Tilton because his lawyer, believing the order to be illegal, advised him not to appear in court. However, the court stated that it would not prevent Premier et al. from questioning Tilton about the injunction; and no one contested the right of counsel to pursue the effect that the injunction, valid or not, had on Tilton's actions or attitude. Because the court was careful to allow full exploration of the subject, and because the court had valid concerns about the document's authenticity, it was not an abuse of discretion to exclude it from evidence.
 
 2. McIntyre
 
 31
 The trial court did not err in allowing McIntyre to testify for the purpose of showing notice that he became aware in 1974 that the acquired cattle did not cost Premier an average of $1,600 per head as had been represented to its investors. Premier et al. argue that notice to McIntyre of acquisition costs was irrelevant because he had no contact with the doctors. However, he was the president and manager of ERA, the sales representatives for Premier; his brother dealt with the doctors; and both men indicated that they would not have sold Premier investments had they known of the inferior grade of the cattle. This evidence showed that Premier had concealed facts even from its sales representatives. It was therefore relevant.
 
 3. McCalla
 
 32
 Arguing that cross-examination on collateral matters is limited to discrediting the witness, Premier et al. claim that McCalla, a former vice-president of Premier, should not have been allowed to be questioned on any prior lawsuits. Martin v. United States, 404 F.2d 640 (10th Cir.1968), cited by Premier et al., is inapposite. Martin was a criminal case in which the defendant brought up his prior felony conviction on direct examination. The question in this case is whether the plaintiff doctors should have been allowed to raise the question of civil suits against Premier and Dr. McCalla on cross-examination.
 
 
 33
 It was not an abuse of discretion to permit this cross-examination. Rule 611(b) of the Federal Rules of Evidence defines the scope of cross-examination:
 
 
 34
 "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."
 
 
 35
 Premier et al.'s objection that the questioning was "improper" did not sufficiently state grounds for excluding the testimony. Premier et al. cite no relevant authority to support the argument here. See United States v. Hutcher, 622 F.2d 1083, 1087 (2d Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980) (mere statement of objection without stating grounds was insufficient to preserve error, where the specific grounds were not apparent); 1 J. Weinstein & M. Berger, Weinstein's Evidence p 103 at 22 (1982).
 
 4. Ray Record
 
 36
 The trial court excluded Record's deposition testimony regarding the quality of Caravelle cattle which were later obtained by Premier because Record was uncertain and did not have a valid recollection as to that quality. Because the doctors would be unable to cross-examine on this uncertain opinion, the trial court was within its discretion in excluding it.
 
 5. Newspaper articles
 
 37
 The doctors introduced various articles to show notice of a related cattle investment scandal. Premier et al. contend that "no plaintiff was ever asked if he had read any of these ... articles." However, plaintiff Morgan was asked, "Do you remember seeing those articles in newspapers?" The reply was, "Yes. I believe it was publicized in the Wall Street Journal, which I read." Plaintiff Burgess also mentioned having read it in the newspaper. Finally, the trial court was careful to indicate to the jury that the articles were not admitted to show the truth of their allegations.
 
 
 38
 Premier et al. insist that the articles were needlessly cumulative in view of Admitted Fact 88 ("[Bankruptcy] Reorganization and related lawsuits brought allegations of fraud, mismanagement, nonexistent cattle, inferior quality cattle, over-priced cattle, illegal activity and starving of animals in the field, all of which were reported in newspapers, magazines and investment journals.") Premier et al. also argue that the sensationalism of the articles was prejudicial. Although the articles were indeed somewhat cumulative, their admission did not approach an abuse of discretion. Similarly, while the articles were dramatic, they were not unduly prejudicial to Premier et al. because Premier was not the subject of the articles. For these reasons, we affirm the trial court's ruling.
 
 6. Exhibits
 
 39
 Premier et al. cite as error the admission of exhibits 11, 86, 94-97, 247, 258, 401 and 424 on the grounds that they were authenticated only by the fact that they were found in Premier's warehouse. Under Fed.R.Evid. 901(a) "[t]he requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Although for some of the exhibits there was additional authentication, in this case the district court could properly have found that all of the exhibits were adequately authenticated by the fact of being found in Premier et al.'s warehouse.
 
 
 40
 Standard Oil Co. of California v. Moore, 251 F.2d 188 (9th Cir.1957), the authority cited by Premier et al., states that
 
 
 41
 "The existence of a document or its presence in the files of a corporation does not, without more, render it admissible...." 251 F.2d at 215 n. 34.
 
 
 42
 This passage, however, does not deal with the Rule 901 authentication problem. Instead, it deals with 28 U.S.C. Sec. 1732, the predecessor to Fed.R.Evid. 803(6), which establishes the business records exception to the hearsay rule.
 
 
 43
 Premier et al. do not clearly raise any hearsay problems. The problem was essentially one of trustworthiness of the documents. There was no motive shown for anyone to store false documents. Furthermore, any possible error in admitting specific exhibits is more than compensated for by the abundant evidence of fraud. If there was any error, it could not have been prejudicial.
 
 7. Ernst & Ernst worksheets
 
 44
 Under N.L.R.B. v. First Termite Control Co., Inc., 646 F.2d 424 (9th Cir.1981), the doctors should have produced someone to testify as to the recordkeeping methods employed with regard to Premier's file at its auditor, Ernst & Ernst. Id. at 427. According to Premier et al., doctors' counsel stipulated that the custodian of records could not do so. However, even though the documents were used later to establish the connections between Premier and the purchase of inferior quality cattle, any error in admitting the documents without testimony by a qualified witness was not prejudicial because there was no real dispute as to the trustworthiness of the records.
 
 
 45
 8. Exhibits 572, 653-662 compiled in reliance upon the Ernst & Ernst worksheets
 
 
 46
 Because there was no dispute as to the trustworthiness of the Ernst & Ernst worksheets, admission of the charts prepared by doctors' accountant from those worksheets was also not prejudicial error. Although the record shows that use of the Ernst & Ernst documents led to some inconsistencies in the accountant's calculations, such inconsistencies went to the weight, not the admissibility of the evidence.
 
 9. Admissions
 
 47
 During pretrial proceedings, Premier et al. objected to the admissibility of admissions by defendant Bohlen against his co-defendants on the ground that admissions are admissible only against the declarant. Fed.R.Evid. 801(d)(2)(A); United States v. Eubanks, 591 F.2d 513, 519 (9th Cir.1979). The court ruled preliminarily that the admissions could come in under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), and that they would be admitted provisionally subject to Premier et al.'s motion to strike at the appropriate time. Eubanks, 591 F.2d at 519, n. 6. Premier et al. now argue that a conspiracy was never shown and that the admissions were therefore unduly prejudicial. However, Premier never objected or moved to strike during trial and has therefore waived the objection. Id.; Fed.R.Evid. 103(a)(1).
 
 10. Motion in limine
 
 48
 During pretrial proceedings, Premier moved in limine to exclude evidence of its employee stock option plan on grounds of irrelevance and undue prejudice. The court did not abuse its discretion in denying the motion. Fed.R.Evid. 104(a).
 
 
 49
 At trial, the court admitted evidence of the plan without objection. It is not clear whether Premier's pretrial motion in limine preserves the objection for appeal. See Sheehy v. Southern Pac. Transp. Co., 631 F.2d 649, 652 (9th Cir.1980). See also Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir.1980). However, if there was error, it was harmless.
 
 11. Tax information
 
 50
 Because we affirm the trial court's holding that tax benefits are not to be set off in assessing damages, the doctor's tax returns, which the district court excluded, were irrelevant on the issue of damages. Premier et al. note that tax information could shed light on doctors' investment motives and sophistication as investors. See Kramas v. Security Gas & Oil, Inc., 672 F.2d 766, 772 (9th Cir.) cert. denied, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); Smith v. Bader, 83 F.R.D. 437, 438-439 (S.D.N.Y.1979). However, a decision to exclude evidence should not be disturbed unless the district court abused its discretion. Lies v. Farrell Lines, Inc., 641 F.2d 765, 773 (9th Cir.1981); Cohn v. Papke, 655 F.2d 191, 194 (9th Cir.1981). We find no abuse of discretion.
 
 V. Jury Instructions on Liability
 
 51
 Premier et al.'s briefs challenge the jury instructions at length. We have gone over the instructions with care. Some perhaps could have been polished and given in more perfect form, but none incorrectly stated the applicable law and none confused the jury or caused it to return a verdict other than one justified by the law and the facts. Because our review of the copious instructions under Washington law sheds no new light on any federal question, we will leave to the courts of the State of Washington the task of writing such commentary on local law as those courts deem necessary and proper. There was no reversible error in any instruction on liability.
 
 VI. Damages
 1. One loss--one recovery
 
 52
 Although the jury found for the doctors on claims under the Washington Securities Act, under federal securities laws, under the Washington Consumer Protection Act and pursuant to principles of common law fraud and negligent representation, the doctors are entitled to only one recovery for their out of pocket losses, which were determined by the jury to be $496,128. Premier et al. concede the correctness of this sum in their brief.
 
 2. The applicable law
 
 53
 Rescission was an appropriate remedy for the doctors' claims. Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975) cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); RCW 21.20.430(1); Salter v. Heiser, 39 Wash.2d 826, 239 P.2d 327 (1951); Prescott v. Matthews, 20 Wash.App. 266, 579 P.2d 407 (1978).
 
 3. Damage Instruction 1
 
 54
 It was not error to use the words "net loss" to calculate the amount of the rescission recovery. Rescission voids the transaction and returns to both parties the consideration they paid. Prescott, 20 Wash.App. at 268-70, 579 P.2d at 409. The term "net loss" was used to mean just that at trial. It was neither incorrect nor misleading.
 
 4. Negligent misrepresentation awards
 
 55
 The jury improperly calculated the negligent misrepresentation damage awards. For each doctor, the misrepresentation damage amount equals the sum of the statutory claim amounts and the common law fraud amount. The wording of the relevant jury question caused this odd result. For each negligent misrepresentation claim, the jury was asked to find: "With respect to [each defendant] the total amount of this plaintiff's damages in connection with this investment proximately caused by misrepresentations of facts by this defendant equals $______." (Emphasis added.)
 
 
 56
 There is no legal or evidentiary basis for such high awards for misrepresentation. Rescission is accomplished by returning to doctors the $496,128 which the jury found and Premier et al. concede to be the out of pocket loss. Neither benefit of the bargain damages nor special damages, which might exceed the amounts available by way of rescission, were sought because of the general decline in the cattle market. See Prescott and Salter, supra.
 
 
 57
 To avoid unnecessary second trials, losing parties should be discouraged from voicing objections to the form or consistency of a jury verdict after the jury has been dismissed. See Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 534-5 (5th Cir.1974); Skillen v. Kimball, 643 F.2d 19 (1st Cir.1981); Fed.R.Civ.P. 49. However, in this case, setting aside the excessive misrepresentation award by way of remittitur leaves the doctors fully compensated because of their recovery under the securities law claims. Therefore, we do so. Because we set aside the misrepresentation award based on the preceding discussion, we do not address Premier et al.'s other rationales for claiming the award is erroneous.
 
 5. Tax Benefits
 
 58
 Premier et al. claim that the tax benefits received by the doctors (estimated at $339,000) should be deducted from the damage award. In this case, deduction of the tax benefits from damages is inappropriate. The purpose of the damages is to place the doctors in as good a position financially as that in which they would have been had they not made the transaction, i.e., to accomplish rescission. At first appearance it seems inequitable to award the doctors $496,128 (their pretax out of pocket loss) when their after tax out of pocket losses are estimated at only about $157,000; but to simply subtract the tax benefits from damages would place an unfair burden on taxpayers generally. Specifically, the doctors would only be returned to their original position by maintaining their claimed tax losses in addition to the out of pocket losses awarded. Such a result leaves the government bearing the cost of defendants' fraud. A better result is to set damages equal to the doctors' losses exclusive of tax benefit. The doctors will not receive a double benefit from this measure of damages because under the tax benefit rule, their prior tax benefits will be disallowed. Although this court cannot directly disallow the prior tax benefits because plaintiffs' tax liabilities are not directly before us, we presume that the IRS will do its duty if the doctors should actually recover on their judgments and thereafter fail to file amended returns as required by law.
 
 
 59
 We are aware that in other circumstances tax consequences have been considered in determining damages. Tax liability on earnings lost because of premature deaths has been considered relevant in determining damages arising from a plane crash. In Re Air Crash Disaster near Chicago, Ill., 701 F.2d 1189 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). In such cases where there is prospective calculation of damages for which no past tax benefits have been claimed, it is appropriate to calculate damages net of taxes, especially since a personal injury judgment is not taxed. 26 U.S.C. Sec. 104(a)(2). This situation is clearly different from the present tax shelter situation in which the doctors have received substantial benefits at government expense.
 
 
 60
 The Eighth Circuit in Austin v. Loftsgaarden, 675 F.2d 168 (8th Cir.1982), did allow tax benefits to be offset against damages in a securities fraud arising from a real estate tax shelter. The court approvingly quoted Bridgen v. Scott, 456 F.Supp. 1048 (S.D.Tex.1978) for the proposition that
 
 
 61
 "Requiring the jury or this Court to try this case without reference to the tax consequences of the transaction would be requiring the jury and the Court to live in an artificial 'never-never land'." 456 F.Supp. at 1061.
 
 
 62
 While we agree that consideration of tax consequences is relevant for certain purposes, we decline to make the government the banker for fraudulent tax shelter activity. Judge Hardy's analysis in Western Federal Corp. v. Davis, 553 F.Supp. 818, 820 (D.Ariz.1982), is correct in discerning that the economic benefit by way of tax deductions is illusory because amended returns will have to be filed under the tax benefit rule. Mertens Law of Federal Income Tax, Sec. 7.37.
 
 VII. The Cross-Appeal: Prejudgment Interest
 
 63
 The court did not abuse its discretion in refusing to award interest on the federal securities claims and the Washington Consumer Protection Act claims. Whittaker v. Whittaker Corp., 639 F.2d 516 (9th Cir.) cert. denied, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); Wessel v. Buhler, 437 F.2d 279 (9th Cir.1971); Cf. Young v. Whidbey Island Bd. of Realtors, 96 Wash.2d 729, 638 P.2d 1235 (1982) (refusal to treble damages under Consumer Protection Act within court's discretion). The court's decision, which is based on questions of fairness, will be upset only if it is so unfair or inequitable as to require it. Whittaker, 639 F.2d at 533; Wessel, 437 F.2d at 284.
 
 
 64
 The trial court refused to grant doctors prejudgment interest because the award was not necessary to make them whole. This was because they enjoyed tax benefits on their investments which the jury did not consider in calculating damages. Considerations of fairness indicate that doctors should not enjoy their tax advantages twice.
 
 
 65
 For the same reasons, the trial court did not err in refusing to award interest under the Washington Securities Act. Under federal securities laws, an interest award is granted "in response to considerations of fairness" and "is denied when its exaction would be inequitable." Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1961). Such sound standards of justice should not be ignored in the interpretation of Washington law. The purpose of the Washington Securities Act, RCW 21.20.430(1), is only "to reimburse a purchaser for his actual out-of-pocket loss." Garretson v. Red-Co, Inc., 9 Wash.App. 923, 516 P.2d 1039, 1042 (1973).
 
 
 66
 The wording of RCW 21.20.430(1) indicates that an interest award is a separate and discretionary award. It states in pertinent part:
 
 
 67
 "Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010 or 21.20.140 through 21.20.230, is liable to the person buying the security ... to recover the consideration paid for the security, together with interest at 8 percent per annum from the date of payment, costs, and reasonable attorneys' fees ...." RCW 21.20.430(1) (Emphasis added.)
 
 
 68
 The legislature has made an interest award mandatory in some instances. For example, RCW 36.88.250, creating remedies for holders of county road improvement district bonds, states in pertinent part:
 
 
 69
 "[T]he owner of any of the bonds may proceed in his own name to collect the assessments and foreclose the lien thereof in any court of competent jurisdiction and shall recover in addition to the amount of the bonds outstanding in his name, interest thereon at five percent per annum, together with the costs of suit, including a reasonable attorney's fee to be fixed by the court." RCW 36.88.250 (Emphasis added.)
 
 
 70
 Thus, the legislature can and does make a distinction between mandatory and discretionary interest awards, and the interest award in RCW 21.20.430(1) falls into the latter, discretionary category.
 
 
 71
 The general interest statute in Washington, RCW 19.52.010, provides that a loan or forbearance "shall bear interest" at a statutorily fixed rate. Despite use of the mandatory "shall," it is clearly established that interest is awarded only if the forbearance is liquidated in amount. See Mall Tool Co. v. Far West Equipment Co., 45 Wash.2d 158, 273 P.2d 652 (1954). Thus, even use of the word "shall" does not mean interest must be awarded in all cases.
 
 
 72
 Doctors argue that an amendment to RCW 19.52.010, which increased statutory interest, should be applied retroactively. Because we affirm the trial court's refusal to award interest, we do not address this issue.
 
 VIII. Attorney fees
 1. Allowability under Washington law
 
 73
 Premier et al. argue that it was improper for the trial court to award attorney fees to the doctors pursuant to RCW 21.20.430(1), the civil liability section of the Washington State Securities Act.
 
 
 74
 When first enacted in 1959, RCW 21.20.430(1) created civil liability for any person who offered or sold securities by means of fraud or misrepresentation, or in violation of RCW 21.20.140 through 21.20.230, the registration provisions of the Washington Securities Act. RCW 21.20.430(1) provided that the buyer of the securities was entitled to attorney fees, in addition to rescission or damages. When first enacted, it did not provide statutory civil liability or grant attorney fees for violations of RCW 21.20.010, which is Washington's "Anti-fraud Act," the counterpart of federal Rule 10b-5. See Wash.Laws 1959, Ch. 282, Sec. 43(a). In 1977 RCW 21.20.430(1) was amended. Express statutory civil liability for violations of RCW 21.20.010 was added, and the liability for sales of securities by means of fraud or misrepresentation was deleted. Wash.Laws 1977, 1st Ex.Sess., Ch. 172, Sec. 4.
 
 
 75
 Because there was no express statutory civil liability for violations of RCW 21.20.010 before 1977, and most of the actions that the doctors complained of took place before 1977, the doctors proceeded in the district court on a theory of an implied private right of action for damages under RCW 21.20.010. Premier et al. argue that this implied right of action is not a statutory liability, and that RCW 21.20.430(1) grants attorney fees only for statutory causes of action. Therefore, they conclude that the district court erred in awarding attorney fees under RCW 21.20.430(1). We disagree.
 
 
 76
 The trial court correctly held that the statute in effect at the termination of an action, rather than the statute in effect at the commencement of an action, determines whether attorney fees should be awarded. Petersen v. Port of Seattle, 94 Wash.2d 479, 618 P.2d 67 (1980). Accord Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Verrilli v. City of Concord, 557 F.2d 664 (9th Cir.1977); Stanford Daily v. Zurcher, 550 F.2d 464 (9th Cir.1977) rev'd. on other grounds, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). The statute in effect at the termination of this action, i.e., RCW 21.20.430(1) as amended in 1977, provided for attorney fees for violations of RCW 21.20.010.
 
 
 77
 It makes no difference that the Washington legislature had not provided for statutory civil liability for violations of RCW 21.20.010 until 1977. Whether a remedy is sought under an implied private right of action, as doctors did in the trial court, or under an express statutory right of action, as provided by the 1977 amendment to RCW 21.20.430(1), a violation of RCW 21.20.010 continues to be just that. The 1977 amendment to RCW 21.20.430(1) simply changed the remedy available for a violation of RCW 21.20.010.
 
 
 78
 Nelson v. Serwold, 687 F.2d 278 (9th Cir.1982) does not require a contrary result on this point. In that case this court refused to award attorney fees under RCW 21.20.430(2), but the facts in Nelson differ significantly from those in the instant case. In Nelson, an aggrieved seller of securities brought suit for material omissions made by the purchaser of the securities. On our first consideration of the action we held the seller had a right to recover damages under Rule 10b-5. Nelson v. Serwold, 576 F.2d 1332 (9th Cir.1978). However, we later denied the seller's request for attorney fees under RCW 21.20.430 because the conduct of which the seller complained, material omissions in the sale of securities, was not actionable under Washington law until 1977, at which time both a cause of action and attorney fees were provided by an amendment to RCW 21.20.430(2). 687 F.2d at 284. That contrasts with the situation in this case where buyers of securities complain of fraud or misrepresentation in the sale of securities. As already discussed, buyers of securities had an express statutory cause of action for sales made by means of fraud or misrepresentation well before 1977. In addition, buyers of securities had an implied right of action for such sales under RCW 21.20.010. Clausing v. DeHart, 83 Wash.2d 70, 515 P.2d 982 (1973); Hilton v. Mumaw, 522 F.2d 588 (9th Cir.1975); contra Ludwig v. Mutual Real Estate Investors, 18 Wash.App. 33, 567 P.2d 658 (1977), overruled on other grounds, Kittilson v. Ford, 93 Wash.2d 223, 608 P.2d 264 (1980).
 
 
 79
 The trial court was correct in awarding attorney fees under RCW 21.20.430(1).
 
 2. Reasonableness of attorney fees
 
 80
 Doctors submitted documentation to the trial court to support 3,928.3 hours of attorney time and 1,092.7 hours of nonattorney time having been devoted to this case. The case was complex, both legally and factually. Premier et al. made proof difficult both to obtain and to document. Premier et al.'s attorneys, who did not have the laboring oar on burdens of proof and presentation, expended 4,176.76 hours. The trial court found that the hours spent on behalf of the plaintiffs were fully warranted and reasonable. It then correctly determined a total fee following Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir.), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).
 
 
 81
 Premier et al. allege two errors in the trial court's determination of the fees.
 
 
 82
 First, they assert that it was error to award attorney fees based on current, rather than historical, hourly rates. The trial court used current rates to compensate for the effects of inflation and loss of use of funds over the years following initiation of litigation in 1978. Although courts have varied in the method of compensating for inflation and loss of use of funds, they generally consider these factors in determining reasonable attorney fees. Van Gemert v. Boeing Co., 516 F.Supp. 412, 417 (S.D.N.Y.1981). See e.g., Bonner v. Coughlin, 657 F.2d 931, 937 (7th Cir.1981); Gautreaux v. Landrieu, 523 F.Supp. 684, 691 (N.D.Ill.1981) aff'd, 690 F.2d 601 (7th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); Keith v. Volpe, 501 F.Supp. 403, 414 (C.D.Cal.1980); Lockheed Min. Sol. Coalition v. Lockheed M. & S. Co., 406 F.Supp. 828, 834-835 (N.D.Cal.1976) (compensating for inflation and loss of use of funds through the multiplier applied to the base fee); Wheeler v. Durham City Bd. of Ed., 88 F.R.D. 27, 31 (M.D.N.C.1980); In Re Ampicillin Antitrust Litigation, 81 F.R.D. 395, 402 (D.D.C.1978) (compensating for inflation and loss of use of funds by use of current billing rates). A court may, of course, refuse to use current hourly rates on the grounds that increased rates reflect the attorney's increased knowledge and experience, not merely inflation. However, we cannot say that the trial court exceeded its discretion in compensating for inflation and loss of use of funds in the way it did. Kerr v. Screen Extras Guild, supra; Kelly v. Guinn, 456 F.2d 100, 111 (9th Cir.1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973).
 
 
 83
 Second, Premier et al. assert that the trial court should have reduced the award of attorney fees for issues on which the doctors did not prevail and for issues other than those covered by the Washington Securities Act. The trial court correctly found that "[a]ll the claims overlapped to such an extent that the nonprevailing ones are insignificant." It was appropriate for the trial court to award attorney fees for all time reasonably spent in litigating the matter. Seattle School Dist. No. 1 v. State of Wash., 633 F.2d 1338, 1349 (9th Cir.1980), aff'd, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982).
 
 
 84
 The total of attorney fees awarded in this case is substantial; however, it is justified. It is in the public interest that actions such as this be brought so that persons who commit fraud do not benefit from it. Further, although Premier et al. had the right to play hardball in contesting doctors' claims, it is also appropriate that Premier et al. bear the cost of their obstructionist strategy.
 
 IX. Sanctions
 
 85
 Premier et al. appeal only the sanctions for failure to make admissions. Because the trial judge's award of sanctions was contingent on denial of her award of attorney fees on appeal, and because we do not disturb that award, we need not address this issue except as it illustrates the appropriateness of the attorney fees.
 
 
 86
 The award of sanctions was not an abuse of discretion. Chism v. National Heritage Life Ins. Co., 637 F.2d 1328, 1331 (9th Cir.1981). The trial court based the sanctions on costs to doctors' attorneys for travel and deposition taking which Premier et al. made necessary because Premier et al. refused to admit authenticity of almost all of the proposed exhibits, even though the documents came from Premier et al.'s own offices and warehouses. The size of the attorney fee award and the sanctions illustrate how lawyers can multiply costs for both sides by insisting upon all the delaying tactics available under the law. They have a right to insist on using these tactics, but there comes a time when somebody has to pay for them.
 
 
 87
 Premier et al. argue that because there was an issue as to whether the trial court was correct in applying a rule that whatever came from Premier's warehouse was authenticated, the sanctions were improper. The argument is nonsense. Premier et al.'s argument cannot overcome the fact that the trial judge saw through the obstruction and delay and wisely exercised her discretion to decide what to do about it. Chism, 637 F.2d at 1331.
 
 X. Conclusion
 
 88
 The judgment is affirmed in all respects except that (1) the amount of the recovery should be reduced to the sum of $496,128 plus the district court's awards of treble damages of $1,000 per plaintiff under the Washington Consumer Protection Act, costs, and attorney fees, and (2) the district court will enter judgment n.o.v. in favor of Schrock and Darby on all claims.
 
 
 89
 The cause is remanded for the district court to enter a corrected judgment.
 
 
 
 [1]
 A claim under the Washington Consumer Protection Act must be brought within four years of accrual of the cause of action. RCW 19.86.120. Appellants contest only the three year limitations period. See Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir.1980); Errion v. Connell, 236 F.2d 447, 455 (9th Cir.1956). See Jablon, 614 F.2d at 682, (using three year limitations period for federal securities actions in California); RCW 21.20.420(4)(b) (three year limitations period for state securities act in Washington); RCW 4.16.080(4) (three year limitations period for fraud actions)
 
 
 [2]
 In Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir.1980), we upheld the trial court's dismissal of plaintiff's 10b-5 action on the ground that "the trial court correctly held that a reasonably prudent person would have realized within two years" that a securities salesman's predictions were incorrect. 614 F.2d at 682. In this case plaintiffs' knowledge or notice was sufficiently less clear cut that it appropriately went to the jury