In re APPLE COMPUTER SECURITIES LITIGATION.

No. C 84–20148(A) RPA.

United States District Court, N.D. California.

Oct. 19, 1987.

---

William S. Lerach, Milberg Weiss Berhad Specthrie & Lerach, San Diego, Cal., Berger & Montague, P.C., Barrack, Rodos & Bacine, Philadelphia, Pa., Cotchett & Illston, San Francisco, Cal., Kohn, Savett, Klein & Graf, P.C., Albert Ominsky, Ominsky, Joseph & Welsh, P.C., Philadelphia, Pa., for plaintiffs.

Pettit & Martin, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants.

## AMENDED ORDER GRANTING IN LARGE PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

AGUILAR, District Judge.

### I. INTRODUCTION

The Court has been inundated with paper in connection with this motion. Hundreds of pages of briefs and thousands of pages of documents have flooded this Court as plaintiffs struggle to avoid the pains of summary judgment. Two "simple issues" —those of materiality and scienter—lie at the center of conflict. After much careful deliberation and analysis, the Court finds that the majority of plaintiffs' case cannot withstand this motion. As to scienter, the Court will find that there are triable issues of material fact still in dispute which preclude the entry of summary judgment. However, fourteen of the sixteen statements which form the basis of plaintiffs' case are either not misleading or are not material. Therefore, as to these fourteen statements, the Court will grant summary judgment in favor of defendants. The remaining two statements constitute all that is left of plaintiffs' case.

### II. FACTS

The facts are both straightforward and somewhat complicated. The complicated aspect will be analyzed below. A simple rendition of the facts begins with the identification of the plaintiffs, a certified class of investors (hereafter the "class") who purchased stock in Apple Computer, Inc. ("Apple") during the period November 12, 1982 to September 23, 1983 (hereafter the "class period"). At the beginning of the class period, Apple stock sold for approximately $32 per share. During the class period, Apple stock reached a high of approximately $63 per share (in June 1983). On the final day of the class period, after Apple announced a sharp decline in expected profits for the fourth quarter of 1983, the company's stock plummeted to a class period low of approximately $24 per share. Despite the upward swing in value during the class period, the net decline in the value of Apple stock from $32 to $24 per share actually can be accounted for in a single day. On September 23, 1983, the stock declined 25% from $32 to $24 per share.

Apple is a major manufacturer of microprocessor-based personal computer systems with its headquarters in Cupertino, California. Apple products such as the Ap-

ple II, Apple III, Lisa, and MacIntosh microcomputers have generated hundreds of millions of dollars of sales worldwide. As of the time of the filing of the amended class action complaint, Apple reportedly had outstanding some 57 million shares of common stock which are listed to trade and actively have been traded since 1981.

The class is suing the directors and top level executives of Apple for violation of the securities laws. Specifically, plaintiffs sue under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j), and Rule 10b–5 of the regulations of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5 (1987). Plaintiffs allege that defendants recklessly, or perhaps knowingly, made misstatements and omissions of material fact with respect to the sale of the Apple "Lisa" computer.

The Lisa computer was introduced to the public on January 19, 1983. As pointed out by Apple, Lisa incorporated several innovations that significantly facilitated its use. Among these innovations were: the "Mouse," a hand-held controller that allowed communication with the computer without using the keyboard; "icons," pictorial representations of different computer functions displayed on the screen that enabled the user to execute commands using the Mouse; and six integrated software applications that accelerated learning. Apparently all three of these features are now widely used in the industry.

Plaintiffs allege that they relied on misstatements and omissions made by Apple officials relating to the Lisa computer and were injured as a result. Plaintiffs' argument is summarized in the following passage from their brief in opposition to this motion:

> Defendants, Apple and its key officers and directors, knew throughout the November 12, 1982—September 23, 1983 class period that several serious problems were crippling their efforts to develop and manufacture Lisa and impairing Lisa's bid for market acceptance. Despite this knowledge, or in reckless disregard of facts easily accessible to all defendants, Apple issued a series of positive but false statements to the business and financial marketplace which inflated its stock price until the truth began to be revealed at the end of the class period, on September 23, 1983.

*Plaintiffs' Memorandum in Opposition to Apple Computer's and the Officer Defendants' Motion for Summary Judgment* at 2–3 (hereafter *"Opposition Brief"*); *see also* plaintiffs' *Consolidated Amended Class Action Complaint For Violation of Federal Securities Laws* at 2–3 (hereafter the *"Complaint"*).

The two groups of defendants, the "inside" and "outside" directors, have brought motions for summary judgment asserting that plaintiffs (1) have not demonstrated that the alleged misstatements are anything other than the informed and sincere (but erroneous) opinions of Apple officials and (2) have not rebutted defendants' sworn affidavits to the effect that each and every one of them acted honestly and in good faith in making any statements referring to the Lisa computer. The motions will be treated as a single motion for purposes of discussion herein. The task for the Court in this motion is to determine whether plaintiffs have succeeded in establishing the existence of any triable issue of material fact. If defendants can succeed in winning summary judgment on either materiality or scienter, plaintiffs' entire complaint fails.

## III. MATERIALITY

### (A) *Legal Standards:*

▮ The Ninth Circuit has adopted an objective test for materiality. *Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb,* 769 F.2d 561, 565 (9th Cir. 1985). The test is "whether there is a substantial likelihood that a reasonable investor would consider the fact important in making an investment decision." *Id., quoting Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980). This test is drawn from the Supreme Court's opinion in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). After articulating a "reasonable

investor" standard in *TSC,* the Court went on to explain that the standard:

> [D]oes not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his [behavior]. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132; *see also Grigsby v. CMI Corp.,* 765 F.2d 1369, 1372–73 (9th Cir.1985) (quoting above text from *TSC*). The definition of materiality is the same whether misrepresentations or omissions are involved. *Kramas v. Security Gas & Oil Inc.,* 672 F.2d 766, 769 (9th Cir.1982), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600.

The standard for granting summary judgment is fixed by Rule 56(c) of the Federal Rules of Civil Procedure ("Fed.R. Civ.P."). Summary judgment is proper only when (1) the pleadings, affidavits, and other supporting papers permitted by Rule 56(c) demonstrate that there is no disputed issue of material fact, and (2) the moving party is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir.1982).

■ In the context of a motion for summary judgment in a 10b–5 action, courts have been admonished to proceed with great care. Consisting as it does in the application of purportedly objective legal standards to a constellation of facts, the task of assessing materiality is clearly a mixed question of law and fact. The Supreme Court has instructed that the underlying objective facts "are merely the starting point" for the ultimate determination of materiality. *TSC,* 426 U.S. at 450, 96 S.Ct.

at 2133. In the Court's words, the determination requires:

> [D]elicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*Id., quoting Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970).

■ Consistent with the Supreme Court's analysis in *TSC,* the Ninth Circuit has adopted rigorous standards for ruling on summary judgment motions in cases of securities fraud. Summary judgment is normally inappropriate for determining the materiality of undisclosed information, *Caravan Mobile Home,* 769 F.2d at 565, nor for determining the materiality of potentially misleading information. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1306 (9th Cir.1982). A district court should not decide a case of this nature on a motion for summary judgment "unless the court has engaged in meticulous and well articulated analysis of each item of withheld or misrepresented information," *Admiralty Fund, id.* at 1306, and "unless reasonable minds could not differ on the determination of the materiality of the withheld [or misleading] information." *Caravan Mobile Home Sales,* 769 F.2d at 565.

■ Thus, as the moving party, the defendants here have the onerous burden of showing that no reasonable person could conclude that the information disseminated or allegedly withheld by the defendants was material. In other words, the information at issue did not and would not have "assumed actual significance in the deliberations of the reasonable shareholder." *TSC,* 426 U.S. at 449, 96 S.Ct. at 2132. This burden is intensified by the rule that the Court must view all fact and inferences from the facts presented in the light most

favorable to the plaintiffs, the non-moving parties. *Western Reserve Oil & Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 773 (1986).

*(B) Theory of the Case:*

■ Plaintiffs' theory of the case is relevant to how this Court will assess the issue of materiality. Plaintiffs' theory is stated succinctly in § 45 of the Complaint:

> As a result of the foregoing [actions by defendants], the market price of Apple common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, plaintiffs and other members of the Class relied, to their damage, on the integrity of the market as to price.

Plaintiffs' theory is commonly known as the "fraud on the market" theory of recovery. The crux of the theory is that the "integrity" of the market was distorted due to the defendants' material misstatements or omissions. As a result of the distortion, plaintiffs purchased the inflated stock during the class period and were damaged when the misrepresentations came to light thereby causing the inflated stock to plummet in price. *See* Note, "The Fraud–On–The–Market Theory," 95 *Harv. L.Rev.* 1143 (1982); *Shapiro v. Merrill Lynch & Co.,* 634 F.Supp. 587, 596 (S.D. Ohio 1986).

■ The validity of the fraud on the market theory in this circuit was established in the case of *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975). The virtue of this theory, as the court explained in *Blackie,* is that it obviates the reliance requirement under Rule 10b–5 by allowing a plaintiff to recover simply by showing "the causal connection between the defendant's wrongdoing and the plaintiff's loss." *Id.* at 906. Hence, under *Blackie,* a plaintiff may state a case for liability by showing his purchase of a security and a material misrepresentation or omission by the defendant. *Id.; see also Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 68 (D.Or.1983) (discussing *Blackie*).

■ Although causation remains a necessary element to recover under a fraud on the market theory, the court in *Blackie* found that proof of "materiality directly establishes causation more likely than not...." 524 F.2d at 906 n. 22. The rationale for such a view is that "a person who trades during the period in question may be harmed by a deception that affects prices and conditions in the relevant market, regardless of whether or not he has relied upon or even heard the deception." *Little v. First California Co.,* 532 F.2d 1302, 1304 n. 3 (9th Cir.1976), *quoting* Note, "The Reliance Requirement in Private Actions Under SEC Rule 10b–5," 88 *Harv.L. Rev.* 584, 592–93 (1975). Thus, this circuit has concluded that "causation in an open market situation consists in showing that deception affected the market and that damage to the plaintiff resulted." *Little,* 532 F.2d at 1304 n. 3, *citing Blackie,* 524 F.2d at 906.

*(C) The Parties' Characterizations:*

At first glance, plaintiffs and defendants appear to be aboard two different ships passing in the night in their arguments concerning the proper interpretation of the materiality standard in a fraud on the market theory case. On the one hand, plaintiffs argue the hard line that under Rule 10b–5, "[a] duty to speak the full truth arises when a defendant undertakes to say anything." *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *see also Levinson v. Basic Inc.,* 786 F.2d 741, 747 (6th Cir.1986) (quoting *Virginia Bankshares*), *cert. granted,* ——— U.S. ———, 107 S.Ct. 1284, 94 L.Ed.2d 142. According to plaintiffs, if a defendant says "X" and plaintiff knew that "not X" was the truth, plaintiff would be entitled to rely upon the defendant and sue the defendant if plaintiff was damaged as a result of relying on the statement "X."

In contrast to plaintiffs, defendants argue that in a fraud on the market case, a defendant's liability for misstatements or omissions is limited to those material facts not already known in the market. Thus

even if defendant said "X" knowing that "not X" was true, the statement would not be actionable if the fact of "not X" was known to the market. Pushing the perfect market theory to the limit, defendants suggest that even lies are not actionable provided the truth is available in the market.

 After reviewing the pertinent law, the Court concludes that of the two ships in the night, defendants have boarded the proper vessel, although their description of the vessel is somewhat exaggerated. The Court is in agreement with the Seventh Circuit in concluding that in a fraud on the market case, "not every fact must be disclosed." *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529 (7th Cir.1985); *see also Proimos v. Fair Auto. Repair, Inc.*, 808 F.2d 1273, 1277 (7th Cir.1987) ("The materiality of a statement or omission depends on [its] context."). Indubitably, the duty to disclose referred to in Rule 10b–5 is only triggered when disclosure is necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). In the context of the fraud on the market theory in which the circumstances involve the entire market, this Court is not prepared to assume a perfect market (as defendants would have) or blind investors (as plaintiffs would have). Instead, the Court simply will employ the existing standard articulated by the Supreme Court in *TSC.* Specifically, disclosure is only required if the omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449, 96 S.Ct. at 2132. In other words, the focus is not per se upon what was known in the market, but rather upon what effect the disclosure would have had on the market, i.e., would it significantly have altered the "total mix" of information. Therefore, if the information to be disclosed is already known, it probably cannot be considered material. *See Teamster Local 282*, 762 F.2d at 529. With these standards and principles in mind, the Court now turns to the facts surrounding materiality.

### (D) *Facts of Materiality:*

The gravamen of the class action complaint focuses on a series of positive public statements made by officers and directors of Apple. The statements were made in annual and quarterly reports to shareholders, as well as news interviews and periodicals, and contained positive representations about Apple, its finances and management, and the design, development, and introduction of the Lisa computer system. Plaintiffs contend that these statements were materially false and misleading and operated to artificially inflate the market price of Apple common stock. A sampling of the allegedly false statements includes assertions by Apple officials that the company was designing, manufacturing, and introducing a "revolutionary" and "phenomenally successful" new Lisa computer system that would "make Apple's growth before this look small," and that Apple was pleased with orders for the Lisa computer system which was being recognized as a major force in the office market. Plaintiffs contend that these statement were false because, in fact, Apple was undergoing difficult times as a whole and faced serious problems with Lisa. With respect to Lisa, plaintiffs argue that Apple did not have an adequate marketing plant or staff to sell large volumes of Lisa, that Lisa was incompatible with other microcomputer systems (including other Apple computers), that Lisa could not communicate with IBM and other mainframe computers, that Lisa did not have adequate software, that the final development and initial manufacture of the software was a debacle, and that Lisa suffered poor sales, cancelled back orders, and general rejection by important sectors of the targeted market.

At the outset, the Court finds that the claims of falsity with respect to the prospects of Apple overall are without merit. An examination of the record reveals that Apple's profits in fiscal 1983, i.e., September 25, 1982 to September 25, 1983, were *higher* than in any of the three prior fiscal years. To wit, in fiscal 1983, Apple earned $1.28 per share; in fiscal 1982 Apple earned $1.06 per share; in fiscal 1981 Ap-

ple earned $0.70 per share; and in fiscal 1980 Apple earned $0.24. As noted earlier, the entire drop in value of Apple stock during the class period took place on one day, September 23, 1983, when Apple common stock dropped from $32 to $24 per share. The fact is that Apple *remained* a very successful company throughout the class period and any statements to that effect were true. Furthermore, any statements to the effect that Apple would enjoy greater success in 1983 than in any prior year proved to be correct.

Thus, the real issue in this case is whether the hype surrounding Lisa was so inflated as to be false or so exaggerated as to impose a duty on the officers to supplement their statements with negative facts in order to avoid the misleading effect of their positive statements. The parties agree that this issue is at the center of the dispute. Plaintiffs describe their case in the following fashion:

> Defendants have mischaracterized this [case] by asserting that "plaintiffs' complaint is about the wisdom of Apple business judgments." This is not true. At issue are defendants' *public statements,* and whether or not they were misleading. (emphasis supplied).

*Opposition Brief* at 78.

> Similarly, defendants state that:
> Plaintiffs' case depends fundamentally on the materiality of defendants' affirmative expressions of optimism about Lisa because those statements allegedly created a duty to disclose adverse information.

*Defendants' Reply Memorandum In Support of Motion For Summary Judgment* (hereafter *"Reply Brief"*) at 39.

Thus, there is no dispute that this motion focuses on statements made by Apple officers which plaintiffs say were misleading and defendants contend were merely "puffing." After careful consideration of relevant precedent and a review of all the papers relating to the supposed omissions, the Court finds that plaintiffs have not demonstrated that there is a "genuine issue for trial" on the question of materiality with respect to fourteen of the sixteen statements at issue. Fed.R.Civ.P. 56; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In other words, on the basis of the record taken as a whole, "the evidence is such that a reasonable jury could [not] return a verdict for the non-moving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986); *Matsushita,* 106 S.Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

As the above discussion demonstrates, the Court is cognizant of the fact that materiality is largely a factual issue that is ill-suited for summary adjudication. Nevertheless, the Court finds that no reasonable minds could differ on the conclusion that the statements made by the defendants, when viewed with an appreciation for the context in which they were made, do not amount to actionable violations of the federal securities laws. In support of this conclusion, the Court offers the following analysis of the context and the specifics of the alleged misstatements and omissions.

### (E) *Alleged Misrepresentations:*

Plaintiffs have condensed into several pages a list of some sixteen (16) "positive representations" which they allege constitute actionable violations of § 10(b) and Rule 10b–5. The Court will examine each of these statements in turn as they appear in plaintiffs' brief.

### STATEMENT # 1:

■ On November 12, 1982, Apple issued its 1982 Annual Report. Included in the report was a letter by defendants Steven Jobs (Chairman of the Board of Directors and a Vice President) and A.C. Markkula, Jr. (Director and, from 1981 through April 30, 1983, President and Chief Executive Officer) stating the following:

Apple possesses unequalled strength, experience and expertise in the development, manufacture, marketing and support of personal computer systems. It is a form of equity accumulated during six years devoted exclusively to personal computing. Our ability to concentrate our resources on a single business has solidified our leadership and will sustain our market position in this important growth industry. Several major products resulting from this effort will be announced in calendar 1983.... A significant breakthrough in personal office systems will be among these introductions, aimed at professionals, managers and administrators within medium- to large-sized corporations.

The bulk of this statement is plain business hype, the kind of pat on the back, "aren't we great" egotism that characterizes much of corporate America. This type of pride and confidence no doubt is partly responsible for Apple's success. More importantly, such boasting clearly is an expression of opinion. In *Apple's view*, Apple is the strongest, the most experienced, the market leader. As this circuit has stated, "[u]nder the securities law a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable." *G & M, Inc. v. Newbern*, 488 F.2d 742, 745–46 (9th Cir.1973); *see also Hughes v. Dempsey–Tegeler & Co., Inc.*, 534 F.2d 156, 177 (9th Cir.1976), *cert. denied*, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (finding general statements of opinion not actionable). In light of Apple's past success and present spiraling growth, there were sound historical and sound factual bases for this opinion.

■ With respect to the latter half of the statement concerning "a significant breakthrough," this is more than simply hype because it suggests the development of a specific product. If one assumes that the referenced "breakthrough" is the Lisa, then there was a sound factual basis for the statement. At the time Jobs and Markkula wrote, Lisa showed great promise. Indeed, Lisa had great promise, but Apple simply was not able to bring the promise to

physical reality in time. As defendant John Sculley (President and Chief Executive Officer beginning May 1, 1983) admitted on November 7, 1983:

Lisa is a great product, but in hindsight, it was prematurely introduced without datacom, ... without a broad dealer base for distribution, without a system of work-server accessories, and without a tool kit for software developers.

Taken as a whole and considered in historical context, Statement # 1 does not constitute a misstatement of material fact, nor does it create the need for the disclosure of additional information in order not to be misleading.

STATEMENT # 2:

■ Plaintiffs also point to a second statement made in the 1982 Annual Report of November 12, 1982, as an actionable misstatement. Defendant Arthur Rock stated:

From all that I've seen so far, success should continue.

The statement was made in the context of a three paragraph blurb in which Rock stated his optimism about the coming year. Plaintiffs do themselves a disservice by referring to this statement, for seen in context, it is obviously a fair and reasoned statement of opinion. Moreover, the rest of the blurb contains frank admissions about the industry and Apple. What is most relevant in relation to Statement # 2 is the following disclosure which preceded Statement # 2 in Rock's interview:

To me, so far as Apple is concerned, the main accomplishment of 1982 was management's ability to resolve the problems of the Apple III. To remove a key product from the market, re-engineer it, assure quality and successfully re-introduce it shows that management is in charge of its business. They're not young amateurs who can only feed on success. They can take the hard knocks, come back and do well.

To the reasonable investor, this disclosure probably would generate several inferences. First, Rock is admitting that Apple made some errors in judgment with

regard to Apple III; in particular, at the time of its introduction, the computer was ill-equipped to satisfy consumer needs. Second, despite this flaw, Apple management was adept enough to take a product which was already on the market and successfully re-engineer and re-introduce it while still satisfying consumers. Third, this type of flexibility demonstrates that Apple has and can succeed in spite of adversity. Fourth, on the basis of that very recent experience, Rock believed that even in the face of serious "problems," Apple management had demonstrated that it would guide the company to success. Seen in proper context, then, Statement #2 had a sound historical and factual basis and as such is not actionable under § 10(b) or Rule 10b–5.

STATEMENT #3:

■ A third statement taken from the 1982 Annual Report is also cited by plaintiffs:

> Apple refined its planning process in 1982, adopting a methodology consistent with company-wide operations. The process is based on a quarterly update program, during which changes from previous plan expectations can be communicated and acted upon as needed.

Plaintiffs have introduced no evidence to suggest that this statement is factually incorrect. Therefore, the Court will assume that Statement #3 is a factually correct representation simply indicating that Apple had refined its planning process. It appears that this was a prudent move in light of a report of May 24, 1982, in which defendant Markkula states that all would agree that the company's forecasts had two important shortcomings. In particular, Markkula reported that "[t]he accuracy of our forecasts, although much improved, is still not good enough." Plaintiffs' Exh. 53 at 508. Subsequently, Apple did introduce changes in its method of forecasting, drawing on the ideas generated in Markkula's May 24, 1982 report. These improvements were then referenced as Statement #3 in the 1982 Annual Report. The Court is unable to find anything false or misleading

about Statement #3 because it is an unadulterated report of fact.

A final comment on Statement #3. Plaintiffs apparently contend that Statement #3 was misleading because in fact the forecasting method turned out to be a flop. Cases are legion to the effect that 20–20 hindsight in securities cases is equivalent to Monday morning quarterbacking—enjoyable but nonproductive. In this case, plaintiffs point to a statement of June 1983 attributed to Dave Kinser (apparently Apple's Controller) which, in pertinent part, admitted that "[t]he problem of not being able to scientifically analyse (sic) the backlog remains with us." *Opposition Brief* at 41. Another Apple executive reported on July 15, 1983, that:

> We are being too optimistic about current business trends. Our sales forecasting process is not working. This has serious implications on our inventory and expense controls.

*Opposition Brief* at 41.

Obviously these statements cannot be used to question the veracity of Statement #3 which was made over half-a-year earlier. These reports do bear on scienter and relate to the next section of this opinion, but they do not go to establish the fraudulent or reckless nature of Apple's expression of its renovated forecasting techniques.

STATEMENTS #4 and #5:

■ Statements #4 and #5 may be taken together because they both are drawn from the same press release of late November 1982 and relate to the same topic, Apple's new Unifile/Duofile (hereafter "Twiggy") disc drive. The statements are as follows:

> #4 Two high-density floppy disk products which provide new mass storage options for the Apple III personal computer were introduced today by Apple Computer, Inc. The Apple drives ensure greater integrity of data than other high-density drives by way of a unique, double-sided mechanism designed and manufactured by Apple.

#5 The Apple 871 Disk Drive [Twiggy] is the first high-density, double-sided disk drive mechanism to be built specifically for personal computer applications. It represents three years of research and development and has undergone extensive testing and design verification during the past year.

Plaintiffs assert that these positive statements about the Twiggy disk drive were "premature, without reasonable basis, and materially misleading." *Opposition Brief* at 58. There is no doubt that Twiggy was a serious failure for Apple, but plaintiffs do not appear to challenge the truth of Statement #4 and #5. The question is whether the statements were misleading and therefore obligated defendants to provide fuller disclosure of the status of the Twiggy disk drive.

With respect to Statement #4, the Court is unable to find the statement misleading. It merely reports that the Twiggy is being introduced to the market and that it possesses a unique quality that sets it apart from other disk drives.

■ The same cannot be said of Statement #5. In this statement, Apple represents that it has invested a great deal of time and effort into developing Twiggy. The reasonable investor would infer from this that Twiggy was a product that was ready to perform. On this point, the investor was misled, because at that time Twiggy was far from ready to perform. In a memo dated November 12, 1982, i.e., two weeks before the issuance of Statement #5, an internal memo prepared by defendant John Couch (Vice President and General Manager of Personnel) and circulated to upper echelon Apple officials warned:

> We are extremely concerned over the results of our latest run of Twiggy tests. As of 11/12, [November 12, 1982] the current production units show a very high failure rate with unknown mode. The current units will show a very high out of box failure rate and we suspect most of them will fail during the warranty period. This level of problems is frightening, considering we are building

shipable (sic) Lisas beginning in December.

The Court finds this type of information would have altered the total mix of information available at the time Statement #5 was issued. Given the arguably misleading nature of Statement #5, it may have been incumbent on defendants, once they made this positive statement about Twiggy, to provide an accurate picture of the status of the disk drive so as to avoid misleading investors. At any rate, this is a close jury question which is inappropriate for resolution by summary judgment. Therefore, the Court will deny summary judgment with respect to Statement #5 relating to the Twiggy disk drive.

STATEMENT #6:

■ Statement #6 is taken from the press release on January 19, 1983, in which Lisa was introduced to the public. The objectionable statement is the following:

> Lisa incorporates the latest software and hardware technology.... Using Lisa-Terminal, a telecommunication software package ... Lisa functions as ... an IBM-compatible terminal. When linked to Apple-Net, Apple's newly announced local area network, Lisa makes it possible for users to share peripherals and exchange information and files.

As to the first part of the statement, it is not misleading. Apple did not say that Lisa had *all* the latest technology, but rather, in effect, that Lisa is an innovation. No investor would be misled by this statement, for Lisa was an innovation. If anything, a reasonable investor might be put on notice to the fact that "latest technology" might mean "unproven" or "uncertain" technology.

The second part of the statement is also not misleading, but for a different reason. Plaintiffs have elected to omit key portions of the January 19, 1983 news release which provided full disclosure of the actual state of affairs. The key to plaintiffs' argument is that Lisa was not IBM compatible when it was introduced. But in fact, the press release never made such a promise. The

full text around Statement # 6 illuminates this fact:

Using LisaTerminal, a telecommunication software package *being developed* by Apple, Lisa functions as ... an IBM-compatible computer.

Not only did Apple disclose that IBM-compatibility did not yet exist, i.e., it was "being developed," but the company expressly stated that "AppleNet, the Ethernet interface device, and the 3270 data communications package will be available *in late 1983.*" Defendants' Exh. A-2 at 30. In fact, on November 16, 1983, Apple issued the first shipment of both LisaTerminal and the Apple Cluster Controller, products giving Lisa IBM-compatibility as promised.

In their moving papers, defendants admit that AppleNet ultimately was aborted, but aver that the decision to do so was not made until late 1983, after the close of the class period. Furthermore, defendants state that through the summer of 1983 AppleNet was on schedule for a January 1984 release, i.e., only a month behind schedule. Defendants' argument is that because AppleNet was not scheduled to appear on the scene until after the close of the class period, and AppleNet was approximately on schedule throughout the class period and only scrubbed after the class period ended, there was nothing material to disclose during the class period. The logic of this argument is quite appealing.

Plaintiffs do not attempt to attack the IBM-compatibility issue on the basis of what Apple said, but on the basis of what Apple knew. Thus this issue is largely one of scienter for plaintiffs. They have produced several internal Apple documents showing that Apple management handled the compatibility issue very poorly. *See, e.g.,* Plaintiffs' Exhs. 27, 33, and 86. The truth is that as 1983 progressed, Apple officials became more acutely aware of the need for Lisa to be able to interface with IBM products, as well as their own failure to make provisions to accomplish this feat. Nevertheless, mismanagement is not the issue. The question is whether the investor was misled. Plaintiffs have not provid-

ed evidence of any representation to the public made by Apple regarding IBM-compatibility other than the January 19, 1983 press release introducing Lisa. That press release was not misleading, for it made no promise of compatibility before "late 1983." In short, the Court finds that there is no material fact that defendants were obligated to disclose to avoid misleading the public with respect to Statement # 6.

STATEMENT # 7:

■■■ On January 31, 1983, Steven Jobs stated in *Business Week:*

I don't think we will have any trouble selling all the Lisas we can build.

This is a flat out statement of opinion. Statements of opinion are only actionable under the federal securities laws when they lack a sound historical or factual basis. *See Newbern,* 488 F.2d at 745–46 (9th Cir. 1973). As a historical matter, Jobs was speaking from an experience in which he had participated in the development of Apple from an outfit working out of his garage to a company grossing hundreds of millions of dollars in sales. Certainly as a historical fact, Apple had never been unable to sell its product. As a factual matter, internal forecasts at Apple were optimistic about Lisa's prospects and Jobs had ample basis in fact for his statement. Thus, as an expression of opinion, Statement # 7 is not actionable.

In connection with Statement # 7, it is worth pointing out the context in which the statement was reported. The January 31, 1983 edition of *Business Week* magazine ran a story about Lisa entitled, "Apple takes on its biggest test yet." The opening line of the article sets the tenor for the entire piece and powerfully illustrates the context in which Jobs' statement was publicized. The article begins:

If the computer industry were a circus, Apple Computer, Inc. would be a high-wire acrobat performing without a net.

*Business Week,* 1/31/83 at 70.

The article goes on to refer to the fact that Apple was "in the riskiest phase yet of its brief history," and was "going for broke" with the introduction of the Lisa, a

product generating "many questions [from] industry observers." Without going into all the details, it suffices to say that the article thoroughly canvasses those "many questions" and presents a decidedly sobering picture of Apple's prospects with Lisa. The Court must assume that Statement # 7 reached the public via this article since plaintiffs indicate as much with their quotation. Seen in this light, not only is the statement not misleading, but virtually no disclosure by Jobs at that point would have significantly altered the total mix of information already available to investors.

STATEMENTS # 8 and # 9:

On April 14, 1983, the Wall Street Journal published an article entitled, "Some Warm Up to Apple's Lisa, But Eventual Success Is Uncertain." The article begins by noting the "great confidence" at Apple about Lisa. Two quotes are provided and they are Statements # 8 and # 9 of plaintiffs. The first is the view of Steven Jobs and the second is that of John Couch. The statements were as follows:

# 8 Lisa is going to be phenomenally successful in the first year out of the chute.

# 9 This division [that developed Lisa] is going to make Apple's growth before this look small.

Both of these statements fall into the category of expressions of opinion. Due to the predictive nature of these expressions, the Court agrees with plaintiffs that these statements essentially are predictions or forecasts. It does not follow from this characterization that the Court's analysis of materiality should differ with respect to these statements.

Plaintiffs assert that under the court's analysis in *Marx v. Computer Sciences Corporation*, 507 F.2d 485, 490 (9th Cir. 1974), because there was a "disparity between the parties in access to the information necessary to judge the accuracy of the forecast, the company had a duty to disclose all pertinent facts relating to the forecast." *Opposition Brief* at 62. This analysis is applicable to the present case, but not in the fashion envisaged by plaintiffs. *Marx* is not a fraud on the market theory case. Indeed, *Marx* predates the Ninth Circuit's acceptance of the fraud on the market theory in *Blackie*. Mr. Marx was a "knowledgeable and experienced private investor" who bought stock in Computer Sciences Corporation ("CSC") in reliance upon a favorable forecast announced in a well-publicized speech delivered by a CSC director and vice president. An explicit premise of the *Marx* court's conclusion that the forecast might create liability was that the parties were at a disparity in terms of their "access to the information necessary to judge the accuracy of the forecast." 507 F.2d at 490.

The fraud on the market theory does not focus on the relative information gap between the parties, but rather on the information gap existing between what is known by the defendant and what is known by the general market. Adapting the *Marx* premise to our case in this light, it is clear that Apple had a duty to disclose, vis-a-vis Jobs' and Couch's predictions, only if there was a disparity between what was known by Apple and what was known by the market. This is simply another way of asking whether qualifications or disclosures by Jobs and Couch—which would have made their predictions not misleading—would have altered the total mix of information available to the reasonable investor.

One need look no further than the *Wall Street Journal* article of April 13, 1983 (in which Statements # 8 and # 9 appeared) to see that Apple's optimistic forecast was suitably tempered by other statements reported in the same article. The author of the article informally canvassed the opinions of industry analysts and users presenting a balanced and slightly skeptical view of Apple's prospects for success with Lisa. The article noted various problems with Lisa, including unproven technology ("Lisa's novelty is likely to make buyers wary."), lack of IBM compatibility, questions about software, high price ("Price is a major issue."), and the inclination of buyers to move slowly in gambling on Lisa (The chairman of a market research company

stated that "it will be about a year before companies start deciding to make volume purchases."). Seen in the context of an article raising serious doubts about Lisa's prospects for success, the Court is unable to find defendants had a duty to disclose negative facts in order to prevent their predictions in Statements # 8 and # 9 from being materially misleading.

STATEMENT # 10:

 Statement # 10 is also drawn from the *Wall Street Journal* article of April 13, 1983. The words are those of Apple product marketing manager Barry Smith and the five sentences attributed to Smith are dispersed in two different parts of the article. Taken together these sentences compromise Statement # 10 and they are as follows:

> [T]he Company has increased by 50% its estimate of how many machines it should make by the end of the 1984 first half. What we're finding is the reception of Lisa has been very strong.
> We find people willing to put down $10,-000 without blinking an eye.
> [M]ore companies are willing to commit themselves to larger orders than Apple had expected. They're talking larger numbers for their first order, and a quicker reorder.

Unlike the preceding statements, Statement # 10 is a compilation of assertions of fact, not opinion. The determination of whether this statement is actionable involves a comparison between the content of the statement and the reality at the time the assertions were made. An examination of Apple internal reports and forecasts for the period preceding the April 14th statement reveals that at least part of Statement # 10 is factually correct. Specifically, plaintiffs admit that in March 1983 Apple did increase its projected sales of Lisa by approximately 50% for fiscal year 1983. Furthermore, the backlog of orders for Lisa grew steadily through mid-June of 1983. At the time that Statement # 10 was made, Apple had a backlog of orders for Lisa that exceeded 10,000 units. In other words, at a unit price of approximately $10,000, the value of the Lisa order backlog exceeded $100 million in April 1983—nearly two months before Lisa even had been shipped.

The problem with Statement # 10 is that it gives the impression that these "larger orders" are binding commitments to purchase Lisa. A reasonable investor reading Statement # 10 would conclude that Apple was actually receiving firm orders for the sale of Lisas. The statement that "[w]e find people willing to put down $10,000 without blinking an eye" strongly suggests that people have put down $10,000 to purchase Lisas. The statement that "more companies are willing to commit themselves to larger orders" strongly suggests that companies have made a binding commitment to purchase Lisas. In fact, neither suggestion is accurate because the commitments that Apple was referring to were non-binding. As plaintiff's have pointed out, the backlog which was the basis for Statement # 10 was "soft," i.e., there was no penalty for cancelling orders. So even if buyers had put down $10,000 to place the order—and it is not clear that any such financial commitment was ever obtained—the fact is that buyers were not irrevocably bound to purchase until the product was ready for shipping.

It is conceivable that investors may have been aware that the commitments referred to in Statement # 10 were non-binding, but defendants have not made such an assertion. Accordingly, the Court must assume for the purposes of this motion that this information was not available in the market. Without information alerting one to the fact that the backlog which formed the basis of Apple's supposed commitments was "soft," Statement # 10 is misleading. In order to satisfy the standard of Rule 10b–5, Apple had a duty to disclose the fact of the revocability of the commitments in order to negate the misleading effect of Statement # 10. Hence the Court finds that Statement # 10 may have been a misleading statement of material fact and therefore denies defendants' motion for summary judgment with respect to the materiality of Statement # 10.

STATEMENTS ## 11–14:

 Statements ## 11–14 share a common theme in that they reflect Apple's expression of satisfaction at the market's reception of Lisa prior to shipment of the computer. The text of the statements are as follows:

# 11 We are extremely pleased with the market acceptance and orders to date for our Lisa personal office system.

(4/28/83 by defendants Jobs and Markula in Apple's Second Quarter Report to Shareholders)

# 12 The acceptance of Lisa among accounts has been very strong. I would say, however, that here has been one small surprise ... and that is the interest by private individuals at the dealer level in the Lisa. The demand in that channel has exceeded our earlier expectations.

(5/6/83 by Floyd Kvamme, Executive Vice President for Marketing and Sales at Financial Analysts Meeting)

# 13 The interest by individuals at the dealer level has surprised us.... Major accounts are going about as we had expected but orders are higher than we thought from dealers.

(5/16/83 by Kvamme in *ISO World*, a Framingham, Massachusetts periodical)

# 14 Hoar says that the company is quite pleased with the level of orders placed for the Lisa which he says are double what had been anticipated at the release stage.

(6/5/83 by defendant Hoar in *The Providence*, a Providence, Rhode Island periodical)

There are two ways a reasonable investor might assess this information. An investor might take these views of Apple to be expressions of opinion, reinforcing Apple's other optimistic statements concerning Lisa's prospects. To the extent that Statements ## 11–14 can be construed to be expressions of opinion, they are not actionable because Apple had a "rational" basis for such assertions. *See Marx*, 507

F.2d at 490 n. 7. This rational basis is found in the fact that the optimism about dealer acceptance and orders was reflected in the actual reports and orders received from dealers.

Alternatively, a reasonable investor might view these statements as representations of fact. Insofar as any part of Statements ## 11–14 are factual, they are factually correct. As outlined in Apple's papers in support of this motion, Apple's backlog of orders outstripped original expectations through mid-June of 1983. Apple's own internal forecast for fiscal 1983, dated October 1982, pegged Lisa sales for the entire 1983 year at 10,300 units. Yet in early April of 1983, Apple already had outstanding orders for Lisa exceeding 10,000 units. Indeed, plaintiffs admit that as late as mid-June of 1983, Apple had a backlog of Lisa order of nearly 15,000 units. Dealer reaction was particularly favorable and dealer orders alone were forecasted to exceed the overall sales objective for fiscal 1983. The article in which Statement # 13 appeared included reference to the periodical's own survey which corroborated the remarks of Apple's Kvamme. To wit, *ISO World* was told by dealers whom it contacted that the "response has been very favorable, much greater than expectations." Plaintiff's Exh. 4. The president of a computer outlet in San Jose, California reported that "[w]e have on order more Lisas than any other machine we have sold, including the Apple II and the IBM PC." *Id.* Thus, as a matter of objective fact, the content of Statements ## 11–14 is accurate and is not actionable under the securities laws.

STATEMENT # 15:

 Statement # 15 is a five sentence blurb that appeared June 13, 1983, in a Reuter wire service financial report. The statement quoted an Apple official named DeVaughn as representing that:

Apple began volume shipments June One [1983] of its new $10,000 Lisa Computer. "The product has been well-received and shipments are running ahead of expectations."

**1570**

This is a difficult statement to assess for several reasons. First, DeVaughn is never identified in the news blurb and plaintiffs have not identified DeVaughn in their papers, instead referring to him simply as an "Apple spokesman." Second, the context of the statement is not given. When did DeVaughn say this and what else did he say? Finally, to whom did DeVaughn make the statement? Was it a press release or an interview? If it was a press release, were his remarks reported in full elsewhere? Due to the fact that in this motion the Court must view all facts and make all factual inferences in the light most favorable to the plaintiff, the Court will assume that the statement was made by an Apple official to the general public and that no other qualifying or explanatory representations accompanied the statement.

Even while ignoring these unresolved questions, the Court finds that Statement #15 is not actionable. Apple did begin volume shipments of Lisa in June of 1983. Internal Apple documents reflect that Apple actually shipped and sold 1,432 Lisas in June 1983. Defendants' Exh. A-6 at 15102400. With respect to the assertion that shipments were running ahead of expectations, the question is less clear cut. Apple refused to publicize what those expectations were. Part of the Reuters blurb that was not quoted by plaintiffs stated: "DeVaughn decined to give any specific estimates on total third quarter sales and profits or shipment figures for the Lisa computer." Thus the only expectations implicated by Statement #15 are those of Apple itself.

In surveying the documents, the Court is unable to pinpoint precisely what Apple's productions expectations were at the beginning of June 1983. It is clear that those expectations must have changed in view of Apple's failure to meet its own internal (and secret) goal of initiating shipments in late spring. In a June 7, 1983 "Corporate Forecast Report," production for the fourth quarter of 1983 was described as "constrained based on the manufacturing capacity as of June 1st." Defendants' Exh. 14. A report delivered to the Board of Directors on June 27, 1983, stated that approximately 2,000 units would be be shipped in the month of June. Defendants' Exh. 43. And an inter-office memo of June 20, 1983 reported that the manufacturing constraint for Lisa in June was 1,900 units and estimated that 1,500 units would be shipped. Plaintiffs' Exh. 43. Taken together, the foregoing figures suggest that Apple expected to ship roughly 2,000 Lisas in June of 1983. When the dust settled, Apple had shipped only 1,430. Based on these figures alone, the Court is not prepared to conclude that Statement #15 was or was not misleading per se. The question then is whether plaintiffs have adduced any evidence to suggest that at the time the statement was made shipments in fact were not running ahead of expectations.

Plaintiffs have failed to state specifically how Statement #15 was a misstatement or misleading. In order to do so, plaintiffs must offer some benchmark of Apple's expectations and then show that at the time the statement was made shipments did not meet these expectations. No such proof has been offered. The only time plaintiffs broach this subject, they do not focus on June shipments, but rather shipments in July. According to plaintiffs, Apple planned to ship less than 700 Lisas in July of 1983. *Opposition Brief* at 34. Yet the defendants have stated in their moving papers, without rebuttal by plaintiffs, that July shipments of Lisa were 1,814 units, a figure over double the estimation offered by plaintiffs. Moreover, combining the figures for the units shipped in June and July of 1983 yields a total figure for shipped Lisas that exceeds 20% of the highest estimated backlog figure. This would seem to indicate that expectations were being met.

The Court has wrestled long and hard over Statement #15 in assessing its materiality. After examining the voluminous record more than once in search of an answer, the Court is unable to find any evidence that at the time Statement #15 was made it was a material misstatement or misrepresentation. Furthermore, the Court finds that plaintiffs have not come

forward to produce any evidence to that effect. The words of the Supreme Court in the recent *Celotex* case seem particularly appropriate here:

> The moving party [in a motion for summary judgment] is "entitled to judgment as a matter of law" [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the [ultimate] burden of proof.

106 S.Ct. at 2553.

Because plaintiffs have not adduced evidence showing that Statement # 15 was a misstatement or misrepresentation of material fact, the Court will grant summary judgment to defendants on the issue of the materiality of Statement # 15.

## STATEMENT # 16:

▪ The final statement identified by plaintiffs as the basis for this class action suit is a representation made by defendants Jobs and Sculley in Apple's Third Quarter Report to Shareholders, dated July 27, 1983:

> Customer shipments of the Lisa system began on schedule and we remain pleased with its market acceptance, order rate and dealer enthusiasm. Lisa is clearly being recognized as an important force in the office market.

This statement can be broken down into three parts—fact, opinion, and puffing. The factual component is the assertion that Lisa shipments began on schedule. As already noted, this is factually correct. The opinion component is that Apple itself remained pleased with Lisa general market acceptance. This expression of opinion is only actionable if it does not represent management's view, lacks a rational basis, or is insincere. The question of sincerity is better left to the upcoming discussion of scienter. As to the other factors, it is clear that this statement did represent management's view. Indeed, it was made by the two top management officials to the shareholders on behalf of the management of Apple.

The remaining question is whether there was a rational basis for Statement # 16.

Although plaintiffs offer several arguments to show that Apple had no rational basis for its optimism in late July of 1983, none of their contentions are convincing. To begin with, plaintiffs argue that the Lisa backlog was decreasing by July indicating poor reception of the product by the public. It is true that the backlog of nearly 15,000 units was estimated at 11,000 units in the report to the board of directors on June 27, 1983. But a closer look at this estimate reveals that plaintiffs' interpretation is fallacious. In fact, the report of June 27, 1983, states at the outset that "demand [is] good" for Lisa and that the "backlog [is] conservatively stated at 11,-000 units." Defendants' Exh. 43. The report goes on to state that "Beta test results at 17 companies were positive" and that "[a]lmost all Beta sites will buy their units." *Id.* Taken as a whole, this report presents a very positive viewpoint on Lisa's acceptance by the public. If there was some slippage in backlog, it could have been explained in part by the fact that over 1,000 units were shipped in June to meet the backlog. Moreover, Apple was aware that the backlog was "soft" and a slight dip would not be a matter of major concern. Taking all these factors into consideration, there was more than a rational basis for satisfaction with Lisa's acceptance as of June 27, 1983.

Plaintiffs next suggest that reports from Apple's Dealer Advisory Council at its July 12-13, 1983 meeting suggest that there was no basis for an optimistic assessment of Lisa's market reception. If one looks at the condensed minutes of the meeting, it is clear that plaintiffs are mistaken. For although the minutes do state that "the backlog of orders is decreasing," Plaintiffs' Exh. 76, the opening line of the remarks on Lisa states that "[i]t appears that product appeal is more widespread than expected." The minutes also state that "[c]orporate sales are slower than expected, possibly because of the longer evaluation and/or buy cycle and because of the growing strength of IBM." *Id.* Ultimately, the dealer suggested that Apple "relaunch" Lisa with a beefed up advertising campaign

emphasizing "Lisa's uniqueness" and the fact that "Lisa will do things that no other PC [personal computer] can do." Once again, when taken as a whole this report on Lisa's reception is positive and optimistic about Lisa's market acceptance, thus suggesting a rational basis for Statement #16.

The strongest argument that plaintiffs have with respect to the lack of rational support for Apple's publicized optimism in July 1983 is a memorandum of August 15, 1983, which reports that "[o]ur Lisa backlog is now depleted in [the] domestic market." Plaintiffs' Exhibit 81. Assuming that "depleted" means that the Lisa backlog had disappeared, one must infer that the bottom fell out of the Lisa market, for only six weeks before the backlog was pegged at 11,000 units—conservatively. Even more startling is the fact that Apple's own internal July/August 1983 forecast, dated August 1, 1983, predicted fourth quarter sales of 10,000 Lisas and total sales for fiscal 1983 in excess of Apple's 1983 business plan. This contradiction indicates that Apple had a serious problem with the accuracy of its assessment of the Lisa backlog, but it does not establish a dispute, as plaintiffs must in order to prevail here, as to whether Apple's optimism lacked a rational basis. Most importantly, plaintiffs have not demonstrated that as of July 27, 1983, Apple had no rational basis to be pleased with Lisa's market and dealer reception. On the contrary, the facts suggest that given the evidence available to it—including its own internal forecasts and dealer input—Apple had a rational basis for its optimism.

■ The final component of Statement #16 is an element of puffing. The statement that "Lisa is clearly being recognized as an important force in the office market" is such an emphatic statement of opinion that it rises to the level of puffery. Lisa was being recognized as an important force in the office market from the moment the computer was introduced in January 1983. Even in light of Lisa's failure, it is still fair to say that Lisa was "an important force" in office computers, if for no other reason than the potential it possessed and the mar-

ket waves it created. Moreover, boasting such as this is common business practice. Any manufacturer or service provider with any pride in its product would say that its product is an important force or a significant achievement in one field or another. See, e.g., Zerman v. Ball, 735 F.2d 15, 20–21 (2d Cir.1984) (finding that an advertising slogan boasting of the recognized significance of broker's advice is not actionable). In short, a reasonable investor reading this boastful part of Statement #16 would not be mislead even if he believed that Lisa was an important force in the office market. And, in fact, a reasonable investor would take whatever facts could be gleaned from the statement and assess it against the published literature describing the market's actual perceptions about Lisa as found, for example, in *The Wall Street Journal* or *Business Week.*

(F) *Summary of the Analysis of Materiality:*

■ The crux of plaintiffs' argument is that defendants violated the securities laws by making optimistic statements about Lisa and Lisa's prospective success when in fact Lisa faced serious technical and marketing problems. The theoretical underpinning for their argument is the ruling in *Marx v. Computer Sciences Corporation,* 507 F.2d 485, 490 (9th Cir.1974), in which the court found that a jury may find that a defendant, "by ignoring facts seriously undermining the accuracy of [its] forecast, failed to meet the duty imposed by § 10(b)." Without modification, this theory simply does not wash in a fraud on the market case. Instead, in a case such as this, a plaintiff must demonstrate materiality by showing that information withheld by the defendant was necessary to make the representation not misleading and that the information, had it been disclosed, would have altered the total mix of information available to the reasonable investor. With respect to all but two of the sixteen statements offered by plaintiffs as proof of material misstatements by defendants, the Court has found that plaintiffs have not demonstrated materiality—either because the statement itself was not misleading or because the informa-

tion to make the statement not misleading was already available to the market. In light of these findings, the Court concludes that plaintiffs have failed to sustain their burden, in this motion for summary judgment, of coming forward with such evidence that a reasonable jury could find in their favor on the issue of materiality. Good cause appearing therefor, defendants' motion for summary judgment on the issue of materiality is granted with respect to all statements except Statement # 5 and Statement # 10.

IV. SCIENTER

(A) *Legal Standards:*

 In addition to establishing the materiality of a misstatement or omission, to prevail under § 10(b) and Rule 10b–5 a plaintiff must prove that the defendant acted with "some element of scienter." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1385, 47 L.Ed.2d 668 (1976). Scienter requires a showing of some degree of knowing or intentional conduct done with the intent to deceive or defraud. *Id.* at 193, 96 S.Ct. at 1381. In addition, although the question was reserved by the Court in *Hochfelder,* the Ninth Circuit has found that reckless conduct may satisfy the scienter requirement of § 10 and Rule 10b–5. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984); *Harris v. Union Elec. Co.,* 787 F.2d 355, 369 (8th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 94, 93 L.Ed.2d 45 (noting that Ninth Circuit's position is shared as the prevailing view among the circuits). In elaborating on the concept of "recklessness" in the securities fraud context, this circuit has found that "recklessness" is closer to "a lesser form of intent" than "merely a greater degree of ordinary negligence." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434 (9th Cir.1984), *quoting Pegasus Fund Inc., v. Laraneta,* 617 F.2d 1335, 1341 (9th Cir.1980).

 Scienter may be established by a showing that the defendants lacked a good faith belief in the accuracy or completeness of their representations. *See Hochfelder,* 425 U.S. at 206, 96 S.Ct. at 1387. In *Hochfelder,* the Court found the intent of Congress to be quite clear that no one may be made liable under Rule 10b–5 and § 10 "unless he acted other than in good faith." *Id.* In addition, in this circuit, the burden of showing scienter may be met in a case of recklessness by showing that the defendants "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although they could have done so without extraordinary effort." *Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984), *quoting Keirnan v. Homeland, Inc.,* 611 F.2d 785, 788 (9th Cir.1980); *see also Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1283 (9th Cir.1982).

 Generally speaking, scienter is not an issue suitable for determination in a motion for summary judgment. The rule in this circuit is that summary judgment will not be granted on the issue of scienter unless "no reasonable inference supports the adverse party's claim." *Vucinich,* 739 F.2d at 1436 (9th Cir.1984).

(B) *General Allegations:*

Consistent with the relevant legal standards, plaintiffs seek to show scienter by showing that defendants either knew the misleading nature of their statements, or made the statements in reckless disregard of adverse facts that could have been disclosed without extraordinary effort.

Plaintiffs have submitted several pieces of evidence suggesting that Apple in general, and Lisa specifically, might face rough seas in 1983. As an example, plaintiffs refer to a memorandum prepared by Trip Hawkins dated April 28, 1982, and directed to the "Executive Staff and Marketing Council." Plaintiffs quote a portion of the memo which warns that "[W]e are currently betting most of our 1983–1984 growth on risky new products." *See Opposition Brief* at 25. Hawkins states that both Lisa and MacIntosh computers have suffered

"huge schedule delays" and "harbor great technical risks," yet "both are expected to arrive on time in 1983 and provide dramatic revenue increases for Apple." Hawkins concludes by stating that "we simply can't expect significant sales from these products in fiscal 1983."

Hawkins' memorandum does not conclude on this negative note, however, for he goes on to suggest various "response[s]" to these issues which will allow Apple to confront these challenges. For example, Hawkins argues that Apple's objective should be to "[e]stablish Lisa/Mac-class products as the new standard for competition in the 1980's and secure an installed base lead analagous to that which Apple II currently enjoys." Plaintiffs' Exh. 10 at 533. This refers to the concept of fixing one's computer as a desirable target for third-party suppliers. Hawkins indicates that Lisa might serve as the base for such a strategy which Apple could then exploit by producing an Apple software development program. The overall tenor of Hawkins' memo is one of constructive criticism. Taken as a whole, it does not support an inference that Apple executive knew Lisa was going to fail or that Apple itself was in trouble.

The facts are clear that Apple and the defendants in this action were fully aware of the risks and challenges they faced. Moreover, Apple officials were prepared candidly to admit that their industry is subject to vicissitudes. An example of such an admission is found within the text of the 1982 Annual Report. While plaintiffs sought to attach liability to part of the statement of director Arthur Rock, they omit reference to the following statement:

[It is a] mistake to place any kind of [limitation?] on this industry—it's open ended. In terms of the overall computer industry from the time that the first computer was developed 30 odd years ago, anybody who attempted to project computer needs and applications was usually quite wrong. We're still a brand new industry.

(C) *Apple's Internal Forecast:*

The foregoing statement is particularly relevant to plaintiffs' assertions of scienter in connection with Apple's internal forecasts. Before addressing those contentions, some background is necessary. In their brief in support of this motion, defendants provide a detailed description of the forecast process. *See Moving Brief* at 18 n. 9. Plaintiffs have not challenged the accuracy of defendants' description; hence, for the purposes of this motion, the Court will accept Apple's own description of its internal forecast preparation process.

Apple's internal forecast, officially dubbed the "Corporate Forecast Report," was the management's basic predictive tool and was distributed monthly to the executive staff, general managers, and all members of the Board of Directors. Apple describes its forecast technique as a "bottom up" process, whereby it collected forecasts from dealers and direct sales people in Apple's sales division. Each month, the distribution division and products division, respectively, would collect competitive information and make their own forecasts. These two divisions would then meet with the sales division and the manufacturing and finance divisions at a monthly corporate forecast meeting. At this major monthly meeting, representatives from each of the divisions discussed their respective forecasts and important competitive information, and together the divisions would reach a concensus on a twelve month market demand forecast. Following the fixing of the forecast, the manufacturing division would produce its manufacturing response (hereafter "build plan") in which it reported the number of units it could build in order to meet the market demand forecast. Completing this planning cycle, personnel and raw material purchasing plans were made on the basis of the build forecasts in the build plan.

The obvious purpose of the internal forecast was to provide Apple management with a realistic idea of market demand. Without such an estimate, management would not be unable to make intelligent decisions regarding marketing, procurement of resources, production, or distribution. Apple had a vested interest in insuring the highest degree of reliability for its internal forecasts. Apple not only would derive no benefit, but would risk irrepara-

ble injury by generating falsified or deliberately exaggerated market predictions. Moreover, for competitive as well as practical reasons, Apple maintained the forecasts as confidential information. Plaintiffs have never alleged that the forecasts themselves were ever made public or used for any purpose other than as a crucial guide to Apple's own internal management process.

(D) *The Dispute Over Scienter:*

Some of defendants' most creative argumentation is dedicated to establishing the non-existence of sufficient evidence of scienter to withstand the present motion. The key component of defendants' argument is to miscast plaintiffs' position and thereafter to annihilate the strawman. To wit, defendants reduce plaintiffs' scienter argument to the simple assertion that "Apple made and stated the wrong judgments about Lisa's risks and prospects for success." *Reply Brief* at 8. Further, Apple argues that plaintiffs' position is grounded:

[O]n the proposition that when a corporation in good faith reaches a conclusion or opinion on a matter of subjective judgment concerning success and risk and states its conclusion publicly, it nevertheless has a federal securities law disclosure obligation to judge its opinion and conclusion to be wrong, and to state the "correct" conclusion, or not to make the statement actually made.

*Reply Brief* at 14.

██ In fact, this is a significant oversimplification of plaintiffs' position. The point is not that Apple made erroneous business judgments, but rather that Apple officials made positive statements to the public about Lisa even while knowing certain negative facts about the new computer and its prospects for success. Defendants moved out from behind the generous shield of the business judgment rule once they started to make public statements about Lisa. At that point, the federal securities laws came into play and defendants were liable to the same extent as any other business actors for the content of their statements. There is nothing revolutionary about this. Nor is there anything calamitous in the proposition—which is the accurate description of plaintiffs' position—that once defendants spoke publicly they had a duty to avoid misleading the public. This did not require Apple officials to view their statements as wrong, but merely to be careful *not* to be wrong or misleading. In the context of the issue of scienter, the implication for a defendant who misleads or misstates is that he may be held liable if the plaintiff can show that the defendant knew or was aware of facts which suggested the error of his statement.

(E) *Analysis and Conclusion of the Scienter Issue:*

██ For purposes of analyzing scienter, the Court begins from the premise that both Statements # 5 and # 10 were material. The question then is whether defendants knew, were aware of, or were recklessly indifferent to facts that contradicted their statements and thereby put them on notice as to the misleading character of Statements # 5 and # 10. As described in the discussion of materiality, Statement # 5 was made in a context in which Apple officials were aware of serious problems with the Twiggy disk drive. At the very least, Apple had reasonable grounds to believe that material facts were being misstated, "but nonetheless failed to obtain and disclose such facts although they could have done so without extraordinary effort." *Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984), *quoting Kiernan v. Homeland, Inc.,* 611 F.2d 785, 788 (9th Cir.1980). Similarly, with respect to Statement # 10, Apple officials were aware of the "softness" of their backlog. Given the non-binding quality of the orders for Lisa and the evidence on the record establishing knowledge of the hazards of relying on backlog estimates, plaintiffs have demonstrated sufficient facts to withstand defendants' motion on the issue of scienter with respect to Statement # 10. Therefore, the Court will deny defendants' motion for summary judgment on this issue of scienter with respect to Statements # 5 and # 10.

## V. CONCLUSION

The Court has found that the vast majority of the challenged statements made by

defendants were either not misleading or were stated in a context which did not create a duty of disclosure on the part of defendants. Adhering to the language and spirit of the Supreme Court in *TSC*, this Court has attempted to make the "delicate assessments" necessary to ascertain the materiality of these statements to an investor, given the analytical context of a fraud on the market theory of recovery. In light of *TSC* and the many Ninth Circuit cases applying *TSC*'s teachings, the Court therefore HEREBY GRANTS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF MATERIALITY WITH RESPECT TO ALL OF PLAINTIFFS' CASE EXCEPT STATEMENTS # 5 AND # 10.

On the issue of scienter, the Court has found it necessary to assess only Statements # 5 and # 10. Plaintiffs have raised facts and inferences that are subject to dispute with respect to these two statements. Accordingly, the Court must and HEREBY DOES DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF SCIENTER.

IT IS SO ORDERED.